IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AARON D. MARTIN, on behalf of himself and all others similarly situated, | : | CIVIL ACTION |
| Plaintiff | : | |
| vs. | : | DOCKET NO. |
| | : | JURY TRIAL DEMANDED |
| FORD MOTOR COMPANY | : | CLASS ACTION |
| Defendants | : | |

## CLASS ACTION COMPLAINT

1.      This action is brought by Plaintiff, Aaron D. Martin, pursuant to Fed.R.Civ.P. 23(b)(1)(A), on his own behalf and on behalf of all other persons similarly situated for damages arising from violations by Defendants, Ford Motor Company's ("Ford), breach of the implied warranty of merchantability and breach of express warranty.

2.      The above-referenced causes of action are brought with respect to a design feature which appears in all of Ford's Windstars for the model years of 1999, 2000, 2001, 2002 and 2003, which renders the vehicles unfit, unsafe and unmerchantable.

3.      Specifically, the rear axle is an unsealed, hallow cylinder that because of its design collects and traps water and other corrosive agents, causing it to rust from the inside out.

This problem is compounded by the fact that these axles do not contain drainage ports. Ultimately, the rust weakens these axles, which bear significant loads while the vehicle is being operated, and renders the vehicle's axle susceptible to failing while the vehicle is being operated.

## THE PARTIES

4. Plaintiff, Aaron D. Martin, is an adult individual and citizen of the Commonwealth of Pennsylvania, residing at 113 Ronway Drive, Avondale, Pennsylvania. He brings this action in his own right and on behalf of all others similarly situated.

5. Defendant Ford is a corporation duly organized and existing under the laws of the State of Delaware, having a principal place of business at One American Road, Dearborn, Michigan. Ford engages in continuous and substantial business throughout the United States, and more specifically within the District in which this Court is situated, and is a well known seller of motor vehicles. Defendant Ford, distributed and sold vehicles under the Ford name, one of which was the Windstar model involved in this case.

6. Ford issue a warranty set forth in the warranty booklet delivered with each new Windstar, and it is responsible for the design, manufacture, sale and distribution of the Windstar vehicle.

7. Pursuant to the Class Action Fairness Act of 2005, specifically 28 U.S.C. § 1332(d)(2), federal jurisdiction exists because at least one of the members of the proposed class is a citizen of a state other than the state(s) of the defendant's citizenship, and the total amount in controversy exceeds $5 million exclusive of interest and costs. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The Court has personal

jurisdiction over the defendant, because defendant is authorized to conduct business in Pennsylvania and does conduct business in Pennsylvania, and has sufficient minimum contacts with this Commonwealth and/or sufficiently avails itself of the markets of this Commonwealth through its promotion, sales and marketing efforts so as to render the exercise of jurisdiction within this Commonwealth permissible.

8.  In 1994, defendant Ford introduced a new minivan model known as the Windstar, which replaced an earlier model known as the Aerostar. After several years on the market, a redesigned Windstar was introduced to the United States market in 1999. Ultimately, the Freestar replaced the Windstar in 2004.

9.  Upon information and belief, the design flaw subject to this Complaint applies Windstar manufactured and sold after the redesign -- model years 1999, 2000, 2001, 2002 and 2003; however, it may be discovered through the course of discovery in this action that earlier Windstars, model years prior to 1999, may have had the same or a similarly defective axle.

10. At all times relevant, defendant expressly warranted the Windstar minivan as set forth in the warranty booklet accompanying the vehicle, and which warranted the minivan to be free from defects or deficiencies in materials or workmanship.

11. Despite this express warranty, the rear axles of the 1999-2003 models of the Windstar minivans contain a critical and inherent design flaw which creates innate structural instability and constant potential for structural failure of the axle during normal operation of the minivan.

12. This design flaw has become the subject of discussion among members of the automotive community, and has resulted in documented failures of the axle assembly, some of which have been reported to have occurred during highway, high speed travel. Upon information and belief, the defendant has learned of such failures.

13. Even following actual and constructive notice of the problem which affects the entire 1999-2003 model runs of the Windstar, defendant has failed to remedy the defects or offer replacements for their defective, unfit and potentially dangerous products.

14. At no time relevant have the defendants ever notified individuals who possess 1999-2003 Windstar minivans that their vehicles might be prone to sudden failure during operation, nor has this design flaw ever been the subject of a recall or service bulletin.

15. The design flaw which affects the axle of the subject minivans is not the product of a manufacturing peculiarity or aberration of a select number of defendant's 1999-2003 model year Windstar vehicles. The design flaw has, does or will affect all members of the Class in the manner set forth above. Because the design flaw may result in spontaneous fracture of the axle, the risk of the manifestation of such an event cannot be predicted in any reliable manner by a consumer, and the risk of the defect's sudden manifestation currently affects all members of the Class and the public at large.

16. It is well accepted that a structurally sound axle is necessary for a minivan to be considered a product of fit, average and merchantable quality, and is in fact a necessity for the normal, usual and safe operation of any minivan. The use of a minivan intended for street use should not result in any sudden or unexpected failure which may cause the minivan's axle to snap, break, fracture or fall apart while the vehicle is in operation.

17. Inasmuch as the defendant has warranted that the minivans are fit for their usual uses, the proclivity for structural failure affecting these minivans violates the defendant's express warranties.

18. Plaintiff Aaron D. Martin owns a 2001 Windstar.

19. At the time of purchase, plaintiff Martin did not know and could not reasonably know that his minivan contained the design flaw described above.

20. Sometime after the purchase of his Windstar, in May 2010, the axle of Plaintiff Martin's minivan cracked and completely failed from internal rust. This failure occurred while the minivan was being operated.

21. The experience of the above representative plaintiff is typical of the experiences of the other class members.

22. As a direct and proximate result of defendant's conduct as set forth above, and as gives rise to the causes of action contained in the enumerated Counts below, plaintiff(s) and the class:

    a. Seek final injunctive relief compelling the defendant to refund the total value of the vehicles owned by the plaintiff and the class members, or institute a recall program during which the vehicles will be repaired at no cost to the owners; and

    b. Demand a finding that the 1999-2003 models of the Ford Windstar violate the implied warranty of merchantability and the express warranties which apply to the minivans; and,

    c. Seek any other appropriate legal or equitable relief as deemed fair and just by the Court under the circumstances.

23. Plaintiff brings this action as a class action pursuant to Fed.R.Civ.P. 23(b)(3) on behalf of himself and all similarly situated individuals. The class on behalf of which he brings this action is defined as follows:

> All individuals within the United States and its territories who have acquired, by lease or purchase, a 1999, 2000, 2001, 2002, or 2003 model year Ford Windstar minivan and still own the vehicle.

24. The class is so numerous that joinder of all members is impracticable. According to the National Highway Transportation Safety Authority, Ford manufactured and sold 1,708,381 Windstars between 1995 and 2003. Therefore, it is believed that approximately 949,100 Windstars were manufactured with a defective axle.

25. There are questions of law and fact common to the class. Representative questions of law and fact include:

   a. Whether defendant's 1999-2003 Windstar minivans possess the design flaw described herein;

   b. Whether the design flaw affecting defendant's 1999-2003 Windstar minivan constitutes a breach of the implied warranty of merchantability and of the express warranty made by the defendant;

   c. Whether the design flaw affecting defendant's 1999-2003 Windstar minivan constitutes a violation of the Song-Beverly Consumer Warranty Act;

   d. Whether the design flaw affecting defendant's 1999-2003 Windstar minivan constitutes a violation of the Magnuson-Moss Warranty Improvement Act;

   e. Whether members of the class are entitled to the current value of a Windstar minivan, and;

   f. Whether members of the class are entitled to have their Windstar minivan repaired by Ford, free of cost;

26. The claims of the plaintiff are typical of the claims of the class. As with all members of the class, plaintiff bought defendant's 1999-2003 Windstar minivan in one of the model years affected by the axle assembly defect(s). Defendant has refused to acknowledge and take action to remedy the design flaw in its 1999-2003 Windstar minivans. Plaintiff's minivan was, like all of defendant's 1999-2003 Windstar minivan, affected by the design flaw alleged herein. The failure of the axle manifested suddenly and without warning in plaintiff's minivan.

27. Plaintiff will fairly and adequately assert and protect the interests of the class because:

    a. Plaintiff has retained counsel experienced in the prosecution of class action litigation, who will adequately represent the interests of the class;

    b. Plaintiff and his counsel are aware of no conflicts of interest between plaintiff and absent class members or otherwise;

    c. Plaintiff has or can acquire adequate financial resources to assure that the interests of the class will not be harmed; and

    d. Plaintiff is knowledgeable concerning the subject matter of this action and intends to vigorously prosecute this litigation.

28. A class action provides the most fair, efficient and appropriate method for adjudicating this controversy, because:

    a. Common questions of law or fact predominate over any questions affecting only individual members. The design flaw at issue in this litigation is a designed-in flaw which affects every single model of the production run of the subject vehicles during model years 1999-2003. Every member of the class is equally affected by this design flaw, and there are no individual issues which predominate over the class-wide questions of law and fact which exist in this controversy, since all of the subject vehicles are unfit and unmerchantable in the same exact manner. No significant questions of law or fact that might affect only individual members or subclasses of individual members exist that cannot be managed through effective subclass definitions, jury interrogatory modifications or otherwise, consistent with sound judicial management,

        due process of law and fundamental fairness to the defendant and the class;

b.   Plaintiff is aware of no difficulties likely to be encountered in the management of the action as a class action. Indeed, given the design flaw which affects all of defendant's 1999-2003 Windstar minivan, and given defendant's uniform treatment of the members of the class and uniform inability and/or unwillingness to remedy the problem, plaintiff believes that this action properly invokes the class action procedural device;

c.   The individual members of the class do not have any significant interest in prosecuting individual actions or controlling the prosecution of individual actions. The costs and issues involved in the litigation of the fitness and merchantability issues involved herein would be so prohibitively high with respect to the relief which might be available in any individual case that it would not be economically efficient for any member of the class to proceed on an individual basis. Moreover, the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members which would not only present the defendant with incompatible standards of conduct, but which might potentially prejudice individual class members, in that separate actions by individual members of the class would effectively result in findings of fact in the first individual action tried being accorded collateral estoppel effect in later actions;

d.   Plaintiff is aware of no litigation already commenced by a member of the class involving the same issues presented in this action

e.   This Court is appropriate for litigation of the claims of the entire class, as the judges of the Court are learned and experienced in class action issues; because defendant conducts substantial business within this District; and because, upon information and belief, a substantial number of the members of the class are citizens of the Commonwealth of Pennsylvania;

f.   The difficulties which are likely to be encountered in the management of this class action are slight in comparison to other controversies which have been brought as class actions, since the controversy is the same with respect to every class member, and issues of individual conduct or action are not likely to arise. In the event any issues arise which do not apply equally to all members of the class, these issues may be effective and readily managed through the creation of subclasses of individual members, jury interrogatory modifications or otherwise, consistent with sound judicial management, due process of law and fundamental fairness to the defendant and the class;

g.   In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient in amount to

       support separate actions, and therefore, the aggregation of claims in a class action ensures that there is a sufficient amount at stake so as to economically justify the best and most zealous efforts in discovery, motion practice and trial against the defendants, whereas individual claims do not justify such expenditures;

h.    It is unlikely that the amount which may be recovered by the individual class members in this action would be small in relation to the expense and effort of administering this action so as not to justify a class action. This is so because of the economies of scale presented by a class action in a case such as this. If handled as a class action, the claims in this action would be subject to a single discovery period, rather than a multiplicity of repetitive and redundant discovery periods in a multiplicity of individual actions. Such class treatment makes the recovery of any given class member large in relation to the expense and effort of discovery and other litigation procedures, since discovery and litigation costs and efforts can be capitated as among the claims of each class member, resulting in lesser expenditures per class member in attorney fees and costs, which, absent class treatment, would otherwise be prohibitive and would threaten to overtake any recovery any class member could expect to obtain in an individual action. Thus, the trial of a multiplicity of individual actions would cause a wasteful depletion of the limited resources of this Court and litigants, and concentrating the litigation of many identical claims in one forum is desirable and in the interests of judicial economy and efficiency. Indeed, the uniformity of the theories of liability and remedy against the defendants are such as to make class treatment especially efficient in this action;

i.    Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making final equitable or legal relief appropriate with respect to the class.

## COUNT I
## Breach of the Implied Warranty of Merchantability

29. Plaintiff and the class incorporate by reference each preceding and succeeding paragraph as though more fully set forth at length herein.

30. At all times relevant, Michigan, the state of defendant's primary place of business, as well as the 48 other states listed below, including the District of Columbia, have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability: Ala. Code § 7-2-314; Alaska Stat. § 45.02.314; Ariz. Rev. Stat. Ann. § 47-2314; Ark. Code. Ann. § 4-2-314; Cal. Com. Code § 2314; Colo. Rev. Stat. § 4-2-314; Conn. Gen. Stat. Ann. § 42a-2-314; 6 Del. Code. § 2-314; D.C. Code. § 28:2-314; Fla. Stat. Ann. § 672.314; Ga. Code. Ann. § 11-2-314; Haw. Rev. Stat. § 490:2-314; Idaho Code § 28-2-314; 810 Ill. Comp. Stat. Ann. 5/2-314; Kan. Stat. Ann. § 84-2-314; Ky. Rev. Stat. Ann. § 355.2-314; La. Civ. Code Ann. Art. § 2520; 11 Me. Rev. Stat. Ann. § 2-314; Md. Code. Ann. § 2-314; Mass. Gen. Law Ch. 106 § 2-314; Mich. Comp. Laws Ann. § 440.2314; Minn. Stat. Ann. § 336.2-314; Miss. Code Ann. § 75-2-314; Mo. Rev. Stat. § 400.2-314; Mont. Code Ann. § 30-2-314; Nev. Rev. Stat. U.C.C. § 104.2314; N.H. Rev. Ann. § 382-A:2-314; N.J. Stat. Ann. § 12A:2-314; N.M. Stat. Ann. § 55-2-314; N.Y. U.C.C. Law § 2-314; N.C. Gen. Stat. Ann. § 25-2-314; N.D. Stat. § 41-02-314; Ohio Rev. Code Ann. § 1302.27; Okla. Stat. tit. 12A § 2-314; Or. Rev. Stat. § 72.3140; 13 Pa.C.S. § 2314; R.I. Gen. Laws § 6A-2-314; S.C. Code Ann. § 36-2-314; S.D. Stat. § 57A-2-314; Tenn. Code Ann. § 47-2-314; Tex. Bus. & Com. Code Ann. § 2-314; Utah Code Ann. § 70A-2-314; Va. Code § 8.2-314; Vt. Stat. Ann. 9A § 2-314; W. Va. Code § 46-2-314; Wash. Rev. Code § 62A 2-314; Wis. Stat. Ann. § 402.314 and Wyo. Stat. § 34.1-2-314.

31. With respect to the 1999-2003 Windstar minivans at issue herein, the defendant are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

32. The 1999-2003 Windstar minivans are "goods" as defined in the various states' commercial codes governing the implied warranty of merchantability.

33. As a merchant of the 1999-2003 Windstar minivans, defendant was obligated to provide buyers with products reasonably fit for the general purpose for which they are sold, that conform to the standards of the trade in which the defendants are involved, and that are of fit and merchantable quality.

34. At the time the 1999-2003 Windstar minivans were designed, manufactured, sold and distributed, the defendant knew the purposes for which the vehicles in question would be used, and impliedly warranted that the same were of merchantable quality, able to pass without objection in the trade, and fit for their ordinary purpose.

35. Defendant breached its implied warranty of merchantability in its sale of the subject minivan to the plaintiff and members of the class. The 1999-2003 Windstar minivans were not of merchantable quality, were not fit for their ordinary purposes, and do not conform to the standards generally applicable to such goods, in that they can fail under normal operating conditions and thereby may pose a grave threat of serious and/or fatal injury.

36. As a direct and proximate result of the defendant's breach of the implied warranty of merchantability, the plaintiff and the members of the class have been injured and suffered damages, in that the vehicles in question are so inherently flawed, unfit and unmerchantable as to

have absolutely no intrinsic or market value due to the design flaw the 1999-2003 models are affected by.

       **WHEREFORE,** plaintiff and the class respectfully pray for the following relief:

a. An Order certifying the class as defined above and appointing the undersigned as counsel for the plaintiff and the class pursuant to Fed.R.Civ.P. 23;

b. Final injunctive relief compelling the defendant to pay the plaintiff and each class member the value of their defective Windstar minivan or, in the alternative, institute a recall pursuant to which the defect will be repair, at no cost to the plaintiff or the class member;

c. A judgment or declaration finding that defendant's 1999-2003 Windstar minivans violate the implied warranty of merchantability, the express warranties which apply to the minivans.

d. An award of punitive damages as allowed under any applicable cause of action asserted herein;

e. An award of attorney fees as allowed under any applicable cause of action herein or as allowed by the Court; and

f. Any other appropriate legal or equitable relief as deemed fair and just by the Court under the circumstances.

## COUNT II
## Breach of Express Warranty

37. Plaintiff and the class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

38. Defendant's 1999-2003 Windstar minivans were expressly warranted by the defendant to be free of flaws in materials, manufacture and design, and to be of fair average quality and fit for their ordinary purposes by virtue of a written warranty provided with the minivan at the time of sale from authorized dealers.

39. As detailed above, defendant manufactured, marketed and sold the subject minivans, representing that the vehicles were of good, fit and merchantable quality when in fact they were not

40. Defendant also expressly warranted that the subject minivans were manufactured to conform to all safety requirements under United States federal and other applicable laws and regulations, industry developed standards including ASTM standards and product-specific standards.

41. The 1999-2003 Windstar minivans did not conform to these express representations because those vehicles were affected by a design flaw which encourages rust to form on the interior of the axle, causing it to become structurally unsound and crack, sometimes to the operation of the vehicle.

42. At all times relevant, Michigan, the state of defendant's primary place of business in the United States, as well as the 48 other states listed below, including the District of

13

Columbia, have codified and adopted the provisions of the Uniform Commercial Code governing the express warranty of merchantability: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. Ann. § 47-2313; Ark. Code. Ann. § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. Ann. § 42a-2-313; 6 Del. Code. § 2-313; D.C. Code. § 28:2-313; Fla. Stat. Ann. § 672.313; Ga. Code. Ann. § 11-2-313; Haw. Rev. Stat. § 490:2-313; Idaho Code § 28-2-313; 810 Ill. Comp. Stat. Ann. 5/2-313; Ind. Code Ann. § 26-1-2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; 11 Me. Rev. Stat. Ann. § 2-313; Md. Code. Ann. § 2-313; Mass. Gen. Law Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2313; Minn. Stat. Ann. § 336.2-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2-313; Mont. Code Ann. § 30-2-313; Nev. Rev. Stat. U.C.C. § 104.2313; N.H. Rev. Ann. § 382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. Ann. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa.C.S. § 2313; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Utah Code Ann. § 70A-2-313; Va. Code § 8.2-313; Vt. Stat. Ann. 9A § 2-313; W. Va. Code § 46-2-313; Wash. Rev. Code § 62A 2-313; Wis. Stat. Ann. § 402.313 and Wyo. Stat. § 34.1-2-313.

43.     At the time that the defendant marketed and sold the subject minivan, they recognized the purposes for which they would be used, and expressly warranted that those minivans were safe and trustworthy vehicles. These affirmations of fact or promises made by the defendants to the plaintiff and the class members specifically related to the 1999-2003 Windstar minivans and became part of the basis of the bargain in every sale within the United States and its territories.

44. Defendants breached these express warranties of merchantability with respect to all sales of the 1999-2003 Windstar minivans, since the vehicles were not of merchantable quality, were not fit for their ordinary purposes, were substandard in quality and design as compared to other competitors' vehicles and did not utilize good and effective design practices.

45. As a direct and proximate result of the defendant's breach of the implied warranty of merchantability, the plaintiff and the members of the class have been injured and suffered damages, in that the vehicles in question are so inherently flawed, unfit and unmerchantable as to have absolutely no intrinsic or market value due to the design flaw the 1999-2003 models are affected by.

**WHEREFORE,** plaintiff and the class respectfully pray for the following relief:

a. An Order certifying the class as defined above and appointing the undersigned as counsel for the plaintiff and the class pursuant to Fed.R.Civ.P. 23;

b. Final injunctive relief compelling the defendant to pay the plaintiff and each class member the value of their defective Windstar minivan or, in the alternative, institute a recall pursuant to which the defect will be repair, at no cost to the plaintiff or the class member;

c. A judgment or declaration finding that defendant's 1999-2003 Windstar minivans violate the implied warranty of merchantability, the express warranties which apply to the minivans.

d. An award of punitive damages as allowed under any applicable cause of action asserted herein;

e.  An award of attorney fees as allowed under any applicable cause of action herein or as allowed by the Court; and

f.  Any other appropriate legal or equitable relief as deemed fair and just by the Court under the circumstances.

GOLOMB & HONIK, P.C.

By: _____
Ruben Honik, Esquire
Richard M. Golomb, Esquire
Kenneth J. Grunfeld
Damien Zillas, Esquire
Golomb & Honik, PC
1515 Market Street, Suite 1100
Philadelphia, PA 19102
(215) 985-9177
(215) 985-4169