IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AARON D. MARTIN, on behalf of himself
and all others similarly situated,

Plaintiff,

v.

FORD MOTOR COMPANY,

Defendant.

CIVIL ACTION
NO. 10-2203

## OPINION

**Slomsky, J.**                                                        **July 2, 2013**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ...................................................................................3

    A.    Three Generations of Ford Windstar Rear Axles .....................................................3

    B.    The Benteler Axle: Model Years 1998½ - 2003 .....................................................5

        1. Initial Testing .................................................................................................5

        2. Post-Test Monitoring .....................................................................................7

    C.    Plaintiff's Ford Windstar .........................................................................................9

    D.    National Highway Traffic Safety Administration Investigation and Ford's
        Voluntary Recall of Select Windstars ...................................................................11

    E.    The Model Warranty Guide ...................................................................................14

III.  STANDARD OF REVIEW ...................................................................................15

IV.   ANALYSIS ...........................................................................................................16

    A.    Federal Rule of Civil Procedure 23(a): Class Action Prerequisites .....................19

        1. Rule 23(a)(1): Numerosity Requirement Satisfied .........................................20

        2. Rule 23(a)(2): Commonality Requirement Satisfied .......................................21

        3. Rule 23(a)(3): Typicality Requirement Not Met for All Classes ...................22

        4. Rule 23(a)(4): Plaintiff Is Not An Adequate Representative for All Classes ...25

B.  Federal Rule of Civil Procedure 23(b)(3):  Class Action Seeking Monetary Damages.................................................................................................28

   1. Express Warranty Class: Common Issues of Fact Do Not Predominate ..........30

   2. Implied Warranty Class: Common Issues of Fact Do Not Predominate ..........40

   3. Consumer Protection Class: Common Issues of Fact Do Not Predominate .....43

   4. Unjust Enrichment Class: Common Issues of Fact Do Not Predominate ........46

   5. Superiority of the Class Action ......................................................................53

C.  Federal Rule of Civil Procedure 23(b)(2): Class Action Seeking Declaratory and/or Injunctive Relief ................................................................................57

V.   CONCLUSION..............................................................................................64

## I.     INTRODUCTION

In May 2010, the rear axle on Plaintiff Aaron Martin's 2001 Ford Windstar unexpectedly cracked.  He claimed the fracture was the result of premature metal fatigue caused by a poorly designed axle.  Based on the alleged defect, Plaintiff filed the instant suit against Defendant Ford Motor Company ("Defendant" or "Ford") on behalf of himself and others similarly situated claiming breach of express and implied warranties, unjust enrichment, and violations of state consumer protection laws.[1]

The same month that the axle fractured, the National Highway Traffic Safety Administration ("NHTSA") launched an investigation into the rear axle installed on 1998½ - 2003 Ford Windstars[2] based on complaints of owners who had problems with their vehicles similar to Plaintiff's.  An initial review of the complaints led the NHTSA to conclude that the axle's design allowed road salt to collect and, at an accelerated rate, corrode the metal.  The NHTSA investigation culminated in a voluntary safety recall by Ford in over twenty-one high-corrosion states.  Although Ford had been aware of the metal fatigue issue since 1998, Ford contends that it was not aware of the combined effect that salt corrosion and metal fatigue would have on the Windstar's axle until after the government began the investigation.

---

[1] Plaintiff is a resident of Pennsylvania.  On February 15, 2011, the Court granted Ford's Motion to Dismiss the Pennsylvania consumer protection claims because they were barred by the economic loss doctrine.  (Doc. No. 39 at 18-21.)  Despite this ruling, Plaintiff still seeks to certify as a class non-Pennsylvanians in order to pursue claims of consumer protection violations based on the law of other states.

[2] As explained below, about midway through production of the 1998 model year, Ford switched axle manufacturers.  Therefore, the first model year a Windstar was manufactured with the alleged defective axle in question here is referred to as model year 1998½ .  (See Doc. No. 67, Ex. C ¶¶ 11, 12.)  This numeric designation will be used in this Opinion.

At the time of the recall in August 2010, the Windstars at issue were seven to twelve years old.  Windstar owners were directed to take their vehicle to a local Ford dealership where their rear axles were inspected.  If an axle showed signs of cracking, the axle was replaced.  If there were no visible cracks, reinforcement brackets were installed.  Ford's inspection data, obtained from the safety recall, revealed that approximately 83.2% of rear axles showed no signs of cracking.  Plaintiff's home state of Pennsylvania was included in the recall, but Plaintiff chose not to participate in the recall.  Instead, he filed this lawsuit.

Presently before the Court is Plaintiff's Motion to certify four classes of Windstar owners.  Specifically, he proposes classes that include all individuals "who have acquired, by lease or purchase, a 1998[ ½ ], 1999, 2000, 2001, 2002, or 2003 model year Ford Windstar minivan and still own the vehicle," who are located in the following places:

> For <u>breach of express warranty</u>, Plaintiff proposes a class consisting of [twenty-three] . . . states[,] [which] . . . [include] Colorado, Delaware, Florida, Hawaii, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, South Carolina, Vermont, Virginia, Washington, West Virginia, Wisconsin and the District of Columbia.
> . . . .
>
> For <u>breach of implied warranty</u>, Plaintiff proposes a class consisting of [twelve] . . . states[,] [which] . . . [include] Alaska, Colorado, Delaware, Hawaii, Louisiana, Nebraska, Nevada, New Jersey, Oklahoma, Pennsylvania, South Carolina, West Virginia and the District of Columbia.
> . . . .
>
> For <u>consumer protection law claims</u>, Plaintiff proposes a class consisting of [twenty-two] . . . states, which . . . include Arkansas, Colorado, Connecticut, Delaware, Florida, Hawaii, Idaho, Illinois, Kansas, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Rhode Island, Washington and the District of Columbia.
> . . . .

> [And] [f]or Plaintiff's <u>unjust enrichment claim</u>, Plaintiff proposes a nationwide class . . . .

(Doc. No. 62 at 1; Doc. No. 83 at 4 n.3, 5, 6 n.6 (emphasis added).)[3]  Plaintiff moves to certify these four classes pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), and seeks injunctive relief and monetary damages on behalf of all class members.  For reasons that follow, the Court will deny Plaintiff's Motion for Class Certification.[4]

## II.   FACTUAL BACKGROUND

### A.   Three Generations of Ford Windstar Rear Axles

While the Ford Windstar was being manufactured, it used three different rear axle designs.  The axles were made by different companies.  The first generation axle, used on model years 1995 through 1998, was manufactured by A.O. Smith (the "Smith Axle").  (Doc. No. 67, Ex. C ¶ 9.)  The Smith Axle had a solid exterior and a stabilizer bar within it, as depicted in the following cross-sectional diagram:

---

[3] Plaintiff initially sought to certify a single nationwide class for all claims.  (<u>See</u> Doc. No. 62 at 1.)  After further briefing, and a June 4, 2012 hearing, Plaintiff revised the class membership. Plaintiff made the revision so that "[f]or all of the claims, the applicable state laws [have been] put into groups that share materially identical legal standards."  (Doc. No. 83 at 4.)

[4] In deciding this motion, the Court has considered the following: Plaintiff's Motion for Class Certification (Doc. No. 62), Defendant's Response in Opposition (Doc. No. 67), Plaintiff's Reply and Notice of Supplemental Authority (Doc. Nos. 73 and 74), documents presented and arguments of counsel at the June 4, 2012 hearing, Plaintiff's Supplement to Proposed Trial Plan (Doc. No. 83), Defendant's Supplemental Memorandum in Opposition (Doc. No. 85), Plaintiff's and Defendant's Memoranda addressing the applicability here of <u>Behrend v. Comcast Corp.</u>, 655 F.3d 182 (3d Cir. 2011) (Doc. Nos. 87 and 88) and <u>Marcus v. BMW of N. Am. LLC</u>, 687 F.3d 583 (3d Cir. 2012) (Doc. Nos. 90 and 91), and Plaintiff's Notice of Supplemental Authority (Doc. Nos. 95 and 96).



(Mot. Class Cert. Hr'g Plaintiff's Slide 3, June 4, 2012.)

The second generation axle, used on model years 1998½ through 2003, was

manufactured by Benteler Automotive (the "Benteler Axle").  (Doc. No. 67, Ex. C ¶¶ 11, 26.)  As

shown in the cross-sectional diagram below, the Benteler Axle, also known as a "rear twist beam

axle," used an inverted "U" channel design without a stabilizer bar:



(Mot. Class Cert. Hr'g Plaintiff's Slide 3, June 4, 2012; Doc. No. 67, Ex. C ¶ 11.)

Finally, the third generation axle, placed into production beginning with model year

2004,[5] was manufactured by Dana and consisted of a design similar to the Smith Axle:

---

[5] Beginning with model year 2004, Ford renamed its minivan the Freestar.  (Mot. Class Cert.
Hr'g Tr. 11:10-14, June 4, 2012; Doc. No. 62, Ex. 10.)



(Mot. Class Cert. Hr'g Plaintiff's Slide 3, June 4, 2012.)

**B.      The Benteler Axle: Model Years 1998½ - 2003**

At issue in this case is the Benteler Axle.  In September 1997, Ford changed axle

suppliers from A.O. Smith to Benteler Automotive to reduce costs and axle weight.  (Doc. No.

67, Ex. C ¶ 11; Mot. Class Cert. Hr'g 71:3-4, June 4, 2012.)  As noted, the Benteler Axle was

placed into production as a mid-1998 model year change.  (Doc. No. 67, Ex. C ¶¶ 11, 12.)

**1.      Initial Testing**

As part of the production process, the Benteler Axle underwent Ford's standard Corporate

Durability Test Procedure.  (Id. ¶ 6.)  Eric Kalis, Ford Design Analysis Engineer, summarized the

procedure as follows:

> Ford has a Corporate Durability Test Procedure . . . designed to produce
> equivalent fatigue damage and wear to Body, Chassis and Powertrain
> components over a vehicle's useful life, to which all of the vehicles Ford
> manufactures are subjected.  Throughout the duration of this testing, a
> specified amount of force (or "load") is exerted on a component over a
> large number of repetitions ("cycles").  The vehicles subjected to these
> tests accumulate a significant number of miles over a relatively short
> time frame and are known as "durability vehicles" which are later
> examined and inspected to monitor overall vehicle and component
> performance.

(Id.)  Ford describes the purpose of the Corporate Durability Test Procedure more fully in a

sixty-nine page manual:

5

> The test is intended to produce equivalent fatigue damage and wear to Body, Chassis, and Powertrain components when tested at either the Michigan Proving Ground (MPG) or Lommel Proving Ground (LPG).
>
> . . . .
>
> The test is conducted in two phases which total the same cumulative damage at either proving ground.
>
> Phase I emphasizes accelerated chassis and body component structural durability based on North Atlantic customer correlated severity for 240,000 km (150,000 miles) of public road usage.
>
> Phase II discontinues severe rough road events, adds high speed Vmax operation, and extends test requirements for all other component durability.

(Doc. No. 67, Ex. C, Ex. 1 (paragraph spacing added).)

In November 1997, about two months after Ford switched to the Benteler Axle, it also made a significant revision to a portion of the Phase I testing. The part revised is known as the "driveway event." (Doc. No. 67, Ex. C ¶ 14.) The driveway event tests the durability of Ford vehicles using four actual driveways, three of which are made of concrete and one made of bituminous material. It is intended to replicate the kind of wear and tear a vehicle would endure traveling up and down a driveway over its lifespan. (Doc. No. 67, Ex. C, Ex. 1 at 4; Mot. Class Cert. Hr'g 19:2-12, June 4, 2012.) According to Engineer Kalis, the revised driveway event "increased the applied stresses to the axle, increased the number of cycles in the test, and changed the direction in which the test was performed," which resulted in "cumulative fatigue damage that was approximately four times greater than Ford's prior standard." (Doc. No. 67, Ex. C ¶14.)

The Benteler Axle had successfully completed the original driveway event test, but in March 1998, while undergoing the revised test, two rear Benteler Axles fractured out of the eleven axles being tested. (Id. ¶¶ 12, 15; Doc. No. 67, Ex. C, Ex. 5.) Ford was initially unsure

what caused the fracture, but theorized that it may have been the result of stones kicked up from the road during testing.  (Id. ¶ 15.)

In July 1998, the Ford Central Laboratory in Dearborn, Michigan, received samples of fractured Benteler Axles for testing purposes.  (Mot. Class Cert. Hr'g Plaintiff's Ex. 5, June 4, 2012.)  The stated objective of the lab analysis was to "[d]ocument the fractures and determine the cause of failure."  (Id.)  On August 6, 1998, the Laboratory reached the following conclusion:

> The two fractured [Benteler] axles . . . . [b]oth failed due to a fatigue crack initiating on the inside of the forward leg of the "U".  The crack origin is nearly identical in location and size which suggests that the initiation site is dependent on stress concentrations and not randomly occurring or due to material defects.

(Id.)

In September 1998, after reviewing these results, Ford conclusively determined that the "root cause of these cracked axles was metal fatigue, likely brought on by the increased load from the new driveway event test of the Corporate Durability Test Procedure."  (Doc. No. 67, Ex. C ¶ 17 (emphasis added).)  The unexpected metal fatigue "was a result of inaccurate furnace atmosphere during the heat treatment portion of the axle production process, which caused the metal to be weaker than intended."  (Id. ¶ 10.)

On October 2, 1998, Benteler Automotive agreed with Ford's diagnosis.  (Doc. No. 67, Ex. C, Ex. 5.)  At this point, "all parties involved [were] actively pursuing alternate design and material options to improve component durability and to pass the new / revised [driveway event] durability course."  (Mot. Class Cert. Hr'g Plaintiff's Ex. 3, June 4, 2012.)

## 2.    Post-Test Monitoring

Over the years, Ford regularly had internal discussions about ways in which to improve the Benteler Axle, and actively monitored the axle's performance in the field, but no changes

were made.  For example, on October 6, 1999, a Ford memo listed "possible actions" to address the problem:

- Heat treated rear axle — Axle has been shown in lab testing to more than <u>double</u> the existing life of the axle.  $3.45 piece cost increase, 770K tooling [i.e., necessary changes in production machinery and equipment], 52 weeks lead time, [zero] weight.

- [Computer-Aided Engineering ("CAE")] redesigned axle — CAE indicated possible solutions without heat treatment.  However, this design would require extensive cost for new tooling and over one year to implement.

- [Smith Axle] — The tools which produced the AO Smith . . . axle still exist, but major cost and timing would be required to recreate the production line.

- Repeat 4-poster testing on Toyota Sienna to determine if competitive vehicles can pass revised [driveway event].  If Sienna fails the test, accept Windstar level of performance.

(Doc. No. 67, Ex. C, Ex. 14 (emphasis in original).)

In 2000, as suggested internally several months earlier, Ford ran the A.O. Smith Axle and a Toyota Sienna axle through the new driveway event test.  Both axles successfully passed the test.  (Doc. No. 67, Ex. C, Ex. 5.)

On June 8, 2000, Ford confirmed that "[f]ractures in the current axle can be prevented by induction heat treatment," although the cost estimates were increased to $4.52 per piece and $850,000 in tooling, and the lead time was decreased to 32 weeks.  (<u>Id.</u>)[6]

On March 30, 2001, Ford explained that "[a]ll potential solutions except heat treatment have been eliminated," but "[h]eat treatment can be incorporated as a 2002 [model year] running

_____

[6] A June 30, 2000 Ford memo notes the disagreement which arose between Ford and Benteler Automotive over who should be responsible for these increased costs:  "Benteler claim[s] . . . that they signed a contract for the axle to meet durability with [the] original driveway event. . . . [and] that [since] the requirements have changed . . . Ford should pick up the cost increase."  (Doc. No. 67, Ex. C, Ex. 5.)

change" at a cost of $653,000 in tooling and a $7.91 per piece price impact.  (Doc. No. 67, Ex. C, Ex. 19.)

In addition to exploring heat treatment remedies, Ford was also monitoring the field performance of the Benteler Axle.  As of October 6, 1999, Ford noted that a "total of 11 high mileage Windstars [were] currently running in vehicle fleets with no reported issues (vehicles have accumulated between 35K – 50K miles each).  No warranty or field complaints [had] been reported on production vehicles."  (Doc. No. 67, Ex. C, Ex. 14.)

As of June 8, 2000, the "11 high mileage Windstars [were still] running in vehicle fleets with no reported issues.  Five vehicles [were] in the AEMS fleet (>100K miles), three in the Romulus taxi fleet (60K-70K miles), and three in the Las Vegas taxi fleet (>100K miles)."  (Id.) Additionally, Ford had "reports, including extended warranty, [that] indicate[d] no axle fracture[s] in the field as of the February 29, 2000 cutoff."  (Id.)

By July 18, 2002, Ford and Benteler Automotive were in the process of testing different heat treated axles.  (Doc. No. 67, Ex. C, Ex. 18.)  The heat treated Benteler Axle did not go into production until March 2003 when they were added to the model year 2003 Ford Windstar. (Doc. No. 67, Ex. C ¶ 26.)  Thus, despite the conclusions Ford reached early on, it continued to manufacture Windstars using the original Benteler Axles — without any modifications — through March 2003.  (See Doc. No. 67, Ex. C ¶ 26.)  Consequently, from September 1997 through March 2003, all Ford Windstars were manufactured using the same Benteler Axle.  (See Doc. No. 67, Ex. C.)

### C.    Plaintiff's Ford Windstar

Plaintiff is an attorney who practices law in Chester County, Pennsylvania.  (Doc. No. 67, Ex. B at 5-9.)  In September 2001, he purchased a used 2001 Ford Windstar.  He bought it for

$22,000 from a family friend, Scott Stanley.  (Id. at 17-19.)  Stanley had purchased the minivan new the year before for approximately $30,000, but was forced to sell it quickly — at what seemed to Plaintiff to be a "great deal" — because Stanley had received a sudden job transfer to London.  (Id. at 37-38.)  When Stanley sold the minivan, it had approximately 16,000 miles and was equipped with many extras, such as a built-in VCR.  (Id. at 20, 38.)  The sale between Stanley and Plaintiff was done informally, most likely without a sales agreement or other documentation.  (Id.)

Plaintiff's Ford Windstar was regularly driven by Plaintiff's wife, Katherine Martin. (Doc. No. 67, Ex. I.)  Prior to the rear axle failure, she was involved in two minor accidents with the Windstar.  (Id.)  In May 2010, Katherine Martin was driving the Windstar when she heard a loud noise and the vehicle felt as if it was going to break.  (Doc. No. 67, Ex. B at 81, 91.)  She called Plaintiff, picked him up at his office, and together they drove the Windstar in an attempt to determine what was causing the strange sound.  (Id. at 83-84.)  Plaintiff decided — after also hearing an unusual noise and feeling the vehicle shake at higher speeds — to take it to their local mechanic.  (Id. at 84-86.)  While driving slowly to the mechanic's garage, Plaintiff suddenly heard a loud noise that sounded like metal scraping on asphalt.  (Id. at 85-86.)  He exited the vehicle and noticed that one of the rear wheels was bent inward.  (Id. at 86.)  Plaintiff then drove the Windstar to his mechanic's shop at a slow speed with much difficulty steering.  (Id. at 88.)  His mechanic later told him that the rear axle, which was heavily rusted at the time, had fractured. (Id. at 94.)  The Windstar had been driven between 80,000 and 100,000 miles when the axle broke.  (Id. at 23-24.)

Plaintiff never again drove the Windstar, and said that he does not "ever want to get in another Windstar.  Someone could even tell [him] it is completely safe.  [He] still wouldn't want

to drive it because [his family] had an experience that was disruptive." (Id. at 109, 117, 125.)

Plaintiff filed the instant lawsuit in May 2010, the same month that his rear axle fractured. (Doc.

No. 1.)

### D. National Highway Traffic Safety Administration Investigation and Ford's Voluntary Recall of Select Windstars

On May 13, 2010, the same day that Plaintiff filed this case, the U.S. Department of

Transportation National Highway Traffic Safety Administration ("NHTSA") began investigating

the Ford Windstar's Benteler Axle. (Doc. No. 67, Ex. C, Ex. 23.) The NHTSA summarized the

background of the investigation:

> The Office of Defects Investigation has received 234 complaints alleging rear axle failure in Model Year [1998½] through 2003 Ford Windstar minivans, including two alleging that the failures resulted in minor crashes. Over half of the complaints (128) allege a complete fracture of the axle beam. Fifty-six complaints indicate that the axle failure occurred at speeds of 40 miles per hour or greater.
>
> One crash occurred while the vehicle was traveling on a highway. The rear axle reportedly "snapped in half" after the vehicle struck a pot hole. The driver indicated that both rear tires "blew" (note that axle fracture often causes the tires to achieve a severe negative camber — with the top of the tire tilted inward — resulting in contact with the fender well). The vehicle then struck a guard rail because of difficulty controlling the vehicle while braking to a stop. The second crash was also alleged to have involved a complete axle fracture, in this case resulting in a low-speed curb impact.
>
> The rear axle beam in the subject vehicles is an inverted "U" channel design, which appears to provide a collection point for road salt slurry, resulting in corrosion that progressively weakens the part until it fractures. Approximately 96 percent of the complaints (225), 94 percent of the complete fractures (121), 96 percent of the high-speed incidents (54) and both alleged crashes are from "Salt-Belt" states. In addition to the two alleged crashes, 14 additional complaints alleged vehicle control concerns associated with the rear axle failure incident.
>
> A Preliminary Evaluation has been opened to assess the scope, frequency and safety consequences of the alleged defect in the subject vehicles.

(Id.)

The NHTSA's Preliminary Evaluation culminated several months later in a voluntary recall conducted by Ford.  On August 26, 2010, Ford sent a letter to all its dealerships throughout the United States outlining the safety recall.  (Doc. No. 67, Ex. C, Ex. 24.)  In the letter, dealerships were provided background information and directed to take certain action:

> **AFFECTED VEHICLES**
>
> Certain 1998 through 2003 model year Windstar vehicles built at the Oakville Assembly Plant from September 1, 1997 through February 28, 2003 and originally sold in, or currently registered in the following states [and the District of Columbia]:

| | | | | |
|---|---|---|---|---|
| Connecticut | Iowa | Michigan | New York | West Virginia |
| Delaware | Kentucky | Minnesota | Ohio | Wisconsin |
| District of Columbia | Maine | Missouri | Pennsylvania | |
| Illinois | Maryland | New Hampshire | Rhode Island | |
| Indiana | Massachusetts | New Jersey | Vermont | |

> . . . .
>
> **REASON FOR THIS SAFETY RECALL**
>
> In some of the affected vehicles, the rear axle could potentially fracture when operated in high corrosion areas (where salt is used on the roadways during winter months) for an extended period of time.  If the rear axle should fracture, vehicle handling may be affected which could increase the risk of a crash.
>
> **SERVICE ACTION**
>
> Dealers are to clean and inspect the rear axle for cracks.  If the rear axle passes the inspection, return the vehicle to the owner along with the "Passed Rear Axle Inspection — No Crack" Customer Information Sheet attached.  If the rear axle did not pass the inspection, contact the Special Service Support Center (SSSC) at 1-800-325-5621 for further instructions.  This service must be performed on all affected vehicles at no charge to the vehicle owner.
>
> . . . .

12

(Id. (emphasis in original).)  Ford also sent a letter to the NHTSA, along with a Defect and Non-Compliance Report pursuant to Title 49, Part 573 of the Code of Federal Regulations, detailing all the steps the company would be taking to address the NHTSA's and customers' concerns about the Benteler Axle.  (Doc. No. 67, Ex. C, Ex. 25.)  Specifically, Ford informed the NHTSA:

> Owners will be notified and instructed to take their vehicles to a Ford or Lincoln/Mercury dealer for an inspection of the rear axle.  Owners of vehicles without axle cracking will be notified when to return for the installation of reinforcement brackets to extend the axle durability in the presence of corrosion.  Owners who have vehicles with cracked axles will either be offered a repair or alternative transportation until parts become available.

(Id.)  Ford estimated that the total number of Windstars sold with the Benteler Axle was 914,789.  (Doc. No. 62, Ex. 42.)  Of those sold, the total number subject to recall — the affected vehicles — was an estimated 462,750.  (Doc. No. 67, Ex. C, Ex. 25.)

On September 22, 2010, after receiving Ford's Defect and Non-Compliance Report, the NHTSA closed its Preliminary Evaluation into the 1998½ - 2003 Windstars because the "action taken by Ford [was] sufficient to resolve the issues raised by th[e] investigation."  (Doc. No. 73, Ex. 5.)  The details of Ford's safety recall were made publicly available on the NHTSA website.  (Doc. No. 62, Ex. 36.)

As of December 2011, approximately fourteen months after Plaintiff commenced this case and the Windstar safety recall was initiated, Ford reported the following results:

| | |
|---|---|
| Subject to recall — 575,000 | Brackets added — 213,700 |
| Not subject to recall — 386,000 | Axles replaced — 51,000 |
| Inspected — 308,700 | Repurchased — 5,400 |
| No cracks observed — 83.2% | Repurchase rejected — 5,800 |

13

(Mot. Class Cert. Hr'g Defendant's Slides, June 4, 2012; see also Doc. No. 62, Ex. 38.)[7]

Plaintiff's 2001 Ford Windstar was subject to the safety recall, but he chose not to participate in

the recall process.  (Doc. No. 67 at 9; Doc. No. 67, Ex. B at 111-12.)

     **E.**    **The Model Warranty Guide**

     Ford's standard express warranty, set forth in its Model Warranty Guide, provided

Windstar owners with limited coverage for parts such as axles:

> Under your New Vehicle Limited Warranty, Bumper to Bumper
> Coverage begins at the warranty start date and lasts for three years and
> 36,000 miles, whichever occurs first.  During this coverage period,
> authorized Ford Motor Company dealers will repair, replace, or adjust all
> parts on your vehicle that are defective in factory-supplied materials or
> workmanship.

(Doc. No. 17-2 at 11-12.)  In addition, the Model Warranty Guide placed limitations on implied

warranties of merchantability:

> [A Windstar owner] may have some implied warranties.  For example,
> you may have:
>
> an implied warranty of merchantability (that the car or light truck is
> reasonably fit for the general purposes for which it was sold); or
>
> an implied warranty of fitness for a particular purpose (that the car or
> light truck is suitable for your special purposes).
>
> These implied warranties are limited, to the extent allowed by law, to the
> time period covered by the written warranties, or to the applicable time
> period provided by state law, whichever period is shorter.

(Id. at 10.)

---

[7] Ford revised the results of the recall over time.  For instance, the original estimate of affected
vehicles was 462,750, which included vehicles from twenty-one states and the District of
Columbia.  Ford eventually added Utah, Virginia, and Puerto Rico to the list of affected
territories, which increased the total vehicle population.  (See Doc. No. 62, Ex. 29; Mot. Class
Cert. Hr'g Defendant's Slides, June 4, 2012.)  Later on, Ford also offered certain early model
Windstar owners the additional option of selling their vehicles to Ford.  (Mot. Class Cert. Hr'g
Defendant's Slides, June 4, 2012.)  Ford also expanded the recall to encompass all model year
2003 Windstars, which included the heat treated Benteler Axles.  (Doc. No. 62, Ex. 29.)

Plaintiff now moves to certify the four classes of 1998½ - 2003 model year Ford Windstar owners.  Plaintiff also seeks declaratory, injunctive, and monetary relief on behalf of the classes.

## III.   STANDARD OF REVIEW

A district court reviews a class certification motion for compliance with the requirements of Federal Rule of Civil Procedure 23.  Rule 23 states in relevant part:

> **(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > **(1)** the class is so numerous that joinder of all members is impracticable;
> >
> > **(2)** there are questions of law or fact common to the class;
> >
> > **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > **(4)** the representative parties will fairly and adequately protect the interests of the class.
>
> **(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
> . . .
>
> > **(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
> >
> > **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Id. (emphasis in original).

In Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013), the United States Supreme Court reaffirmed the principles that must guide a district court's analysis of a class certification motion:

The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23. The Rule does not set forth a mere pleading standard. Rather, a party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).
. . . .

Repeatedly, we have emphasized that it may be necessary for the [district] court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim. That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.

Id. at 1432 (internal citations, quotation marks, and emphasis omitted).

In sum, "every putative class action must satisfy [by a preponderance of the evidence] the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."

Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 590 (3d Cir. 2012).

## IV.   ANALYSIS

In this case, the claims against Ford all stem from the alleged defective rear Benteler Axle used on the 1998½ - 2003 model year Windstars.[8]  Plaintiff has summarized the factual basis for the claims as follows:

---

[8] Plaintiff's counsel characterized the case as follows: "[T]his is an economic impact case, not a personal injury case. So the question really is, did people get what they bargained for; that's why we brought it primarily as a warranty case."  (Class Cert. Hr'g Tr. 141:14-17, June 4, 2012.)

> Ford used a uniform warranty for all [c]lass members with similar, if not identical, terms and [c]lass members nationwide were required to accept Ford's non-negotiable terms.  Ford's own witnesses and documents will demonstrate that Ford knew about the rear axle defect as early as 1998, that Ford failed to disclose this knowledge to [c]lass members, and that all [c]lass vehicles incorporate the same defective axle.

(Doc. No. 83 at 2.)  Moreover, Plaintiff claims that the defective axle caused all class members to suffer harm, namely, repair and replacement costs if the axle has fractured, or a reduction in the vehicle's useful life and/or resale price if the axle has not yet failed.  (Doc. No. 62, Ex. 5 at 3.)

Based on these allegations, Plaintiff seeks certification of four classes, one class for each state law claim against Ford:  breach of express warranty ("Express Warranty Class"), breach of implied warranty ("Implied Warranty Class"), non-Pennsylvania consumer protection laws ("Consumer Protection Class"), and unjust enrichment ("Unjust Enrichment Class").  As previously noted, according to Plaintiff, these Classes are comprised of states with similar laws for each cause of action.[9]

The Express Warranty Class is comprised of 1998½ - 2003 model year Ford Windstar owners located in twenty-three states and the District of Columbia.[10]  To show breach of express warranty — using, for example, Colorado law — Plaintiff must prove:  (1) Ford sold the Windstar; (2) Ford expressly warranted the Windstar was free from defects in material and workmanship; (3) Plaintiff is a person who was reasonably expected to use the Windstar;  (4) the Windstar was not as warranted; (5) the breach of warranty caused Plaintiff harm; and (6) within a

---

[9] Plaintiff, as a resident of Pennsylvania, is only a member of the Implied Warranty Class and the Unjust Enrichment Class, although he seeks to be class representative for all four Classes.

[10] Colorado, Delaware, Florida, Hawaii, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, South Carolina, Vermont, Virginia, Washington, West Virginia, Wisconsin and the District of Columbia. (Doc. No. 83 at 4 n.3.)

reasonable time after Plaintiff discovered or should have discovered the alleged breach of warranty, Plaintiff notified Ford of the breach.  See Colorado Jury Instructions, 4th – Civil, § 14:8 (2013).

The Implied Warranty Class is comprised of 1998½ - 2003 Windstar owners located in twelve states and the District of Columbia.[11]  To demonstrate breach of implied warranty under Pennsylvania law, for instance, Plaintiff must show:  (1) Ford was in the business of selling Windstars; (2) the Windstars were not fit for the ordinary purposes for which such goods are used; and (3) Plaintiff suffered harm as a result of the breach.  See Bentzley v. Medtronic, Inc., 827 F. Supp. 2d 443, 454 (E.D. Pa. 2011) (citing 13 Pa. Cons. Stat. § 2314; Borden, Inc. v. Advent Ink Co., 701 A.2d 255 (Pa. Super. Ct. 1997)).

The Consumer Protection Class is made up of 1998½ - 2003 Windstar owners located in twenty-two states and the District of Columbia.[12]  Using the Arkansas Deceptive Trade Practices Act as an example, Plaintiff can demonstrate a consumer protection violation with evidence that: (1) Ford knowingly made a false representation as to the characteristics of the Windstar; or (2) Ford concealed or omitted a material fact about the Windstar with the intent that Plaintiff rely upon the concealment or omission; and (3) Plaintiff suffered an ascertainable loss as a result of the false representation or omission of material fact.  See Curtis Lumber Co., Inc. v. La. Pac. Corp., 618 F.3d 762, 775-76 (8th Cir. 2010) (citing Ark. Code §§ 4-88-107(a)(1), 108(2)).

---

[11] Alaska, Colorado, Delaware, Hawaii, Louisiana, Nebraska, Nevada, New Jersey, Oklahoma, Pennsylvania, South Carolina, West Virginia and the District of Columbia.  (Doc. No. 83 at 5 n.4.)

[12] Arkansas, Colorado, Connecticut, Delaware, Florida, Hawaii, Idaho, Illinois, Kansas, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Rhode Island, Washington and the District of Columbia. (Doc. No. 83 at 6 n.6.)

Finally, The Unjust Enrichment Class is a nationwide class of 1998½ - 2003 Windstar owners.  Unjust enrichment, under Pennsylvania law, is a "quasi-contractual doctrine based in equity," and requires Plaintiff to demonstrate:  (1) "benefits conferred on [Ford] by [P]laintiff"; (2) "appreciation of such benefits by [Ford]"; and (3) "acceptance and retention of such benefits under such circumstances that it would be inequitable for [Ford] to retain the benefit without payment of value."  Wiernik v. PHH U.S. Mortg. Corp., 736 A.2d 616, 622 (Pa. Super. Ct. 1999) (citation and quotation marks omitted).

Each of these four Classes must independently satisfy the requirements set forth in Federal Rules of Civil Procedure Rule 23(a) and (b)(3).[13]

## A.    Federal Rule of Civil Procedure 23(a): Class Action Prerequisites

As noted earlier, and it bears repetition here, Federal Rule of Civil Procedure 23(a) provides as follows:

> **(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> **(1)** the class is so numerous that joinder of all members is impracticable;
>
> **(2)** there are questions of law or fact common to the class;
>
> **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> **(4)** the representative parties will fairly and adequately protect the interests of the class.

---

[13] As stated previously, Plaintiff also seeks injunctive relief in this case.  For injunctive relief to apply here, Plaintiff has moved to certify a class under Rule 23(b)(2).  All classes, however, must meet the requirements of Rule 23(a), whether certification is sought under (b)(2) or (b)(3).  The Court will address the requirements of Rule 23(a), as they relate to the (b)(2) Class, in a separate section below.

Id. (emphasis in original).  The four requirements of Rule 23(a) are referred to as numerosity, commonality, typicality, and adequacy of representation.  Marcus, 687 F.3d at 590-91.  The requirements will be discussed individually.

### 1.    Rule 23(a)(1): Numerosity Requirement Satisfied

"There is no minimum number of members needed for a suit to proceed as a class action. [The Third Circuit] ha[s] observed, however, that 'generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.'" Marcus, 687 F.3d at 595 (quoting Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)).

"Rule 23(a)(1) does not require a plaintiff to offer direct evidence of the exact number and identities of the class members.  But in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding. Only then may the court rely on 'common sense' to forgo precise calculations and exact numbers."  Id. at 596 (citation omitted).

Here, Ford manufactured and sold over 900,000 Windstars with Benteler Axles throughout the United States in the relevant time period.  Ford has the demonstrated ability to identify and locate current owners:  approximately 575,000 Windstar owners in over twenty-one states were contacted by Ford during the 2010 safety recall.  The exact number and identity of owners for each of the four multi-state Classes is not yet known, but common sense indicates that each Class would consist of far greater than forty members.  Therefore, the four proposed Classes satisfy the numerosity requirement.[14]

---

[14] Ford is not challenging Plaintiff's ability to satisfy the numerosity requirement.  (See Class Cert. Hr'g Tr. 121:4-5, June 4, 2012.)

###### 2.    Rule 23(a)(2): Commonality Requirement Satisfied

"Rule 23(a)(2)'s commonality requirement does not require identical claims or facts among class member[s].  For purposes of Rule 23(a)(2), even a single common question will do."  Marcus, 687 F.3d at 597 (quotation marks and citations omitted).  "[The] common contention . . . must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (internal citations and quotations omitted).

In this case, Plaintiff's four proposed Classes satisfy the commonality requirement. Proving the Benteler Axle was defective is a factual question central to each of Plaintiff's claims — breach of express and implied warranty, consumer protection violations, and unjust enrichment.  "[D]etermination of [the] truth or falsity" of this question will require Plaintiff to present evidence related to the design of the Benteler Axle and Ford's knowledge of the problems associated with this design, among other things.  At this stage of the litigation there is evidence that from September 1997 through March 2003 Ford manufactured all Windstars using the same Benteler Axle design.  Axles with this design failed to pass Ford's revised driveway event test, were the subject of an NHSTA investigation, and were the cause of Ford's voluntary safety recall in August 2010.[15]  Common factual proof concerning the defective axle will help "resolve an issue that is central to the validity" of all Plaintiff's claims.  See Dukes, 131 S. Ct. at 2551.  Consequently, Plaintiff has satisfied the commonality requirement.

---

[15] Ford identified the Windstars in the safety recall letter sent to dealerships as:  "Windstar vehicles built at the Oakville Assembly Plant from September 1, 1997 through February 28, 2003."  (Doc. No. 67, Ex. C, Ex. 24.)

### 3.      Rule 23(a)(3): Typicality Requirement Not Met for All Classes

"Unlike the numerosity and commonality requirements, which evaluate the sufficiency of the class itself, the typicality requirement assesses the sufficiency of the named plaintiff." Sanneman v. Chrysler Corp., 191 F.R.D. 441, 447 (E.D. Pa. 2000).  "The concepts of typicality and commonality are closely related and often tend to merge."  Marcus, 687 F.3d at 597. "Typicality, however, derives its independent legal significance from its ability to 'screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present.'" Id. at 598 (citation omitted).

To determine whether a named plaintiff's "legal or factual position" is "markedly different" from other class members, the Third Circuit has directed district courts to "consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class," focusing specifically on the following:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory;
>
> (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and
>
> (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

Id. (quoting In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 599 (3d Cir. 2009)) (spacing added).  "A common thread running through the various components of typicality . . . is the interest in ensuring that the class representative's interests and incentives will be generally aligned with those of the class as a whole."  In re Schering, 589 F.3d at 599.

Using the guidelines enumerated in <u>Marcus</u>, Plaintiff is a typical representative of the Implied Warranty and Unjust Enrichment Classes.[16]  First, Plaintiff's legal claims and the facts underlying those claims are generally the same as the Class members.  In the relevant years, Ford manufactured Windstars using the same Benteler Axle design.  In September 1998, Ford had knowledge from the revised driveway event test that this design was prone to fracture because of metal fatigue.  Despite this knowledge, Ford made no changes to the Benteler Axle until March 2003.

Plaintiff is the current owner of a 2001 Windstar, a vehicle that was manufactured using the Benteler Axle which was standard on all Windstars during the pertinent time frame.  While driving his Windstar, the rear axle fractured.  The fracture was typical of the problems that ultimately led to Ford's safety recall.  Although Plaintiff's axle actually failed — unlike the majority of Windstar owners — the typicality requirement is still satisfied because the implied warranty and unjust enrichment claims arise from Ford's uniform course of conduct, namely, failing to disclose use of an axle design prone to fatigue cracks in certain situations.  <u>See</u> <u>Danvers</u> <u>Motor Co., Inc. v. Ford Motor Co.</u>, 543 F.3d 141, 150 (3d Cir. 2008) ("Factual differences will not defeat typicality <u>if</u> the named plaintiffs' claims arise from the same event or course of conduct that gives rise to the claims of the class members and are based on the same legal theory.") (emphasis in original).

Second, there is no evidence that Plaintiff would be subject to any unique defenses.  Ford argues that the purchase and ownership of a used vehicle is a defense to an unjust enrichment

---

[16] For reasons stated <u>infra</u>, Plaintiff is not a typical representative on the claims of Express Warranty and the state Consumer Protection laws.  Pennsylvania owners of Windstars are not included in these Classes.

claim under Pennsylvania law, and that Plaintiff, as a used car owner, is subject to this unique defense by Ford.

Plaintiff initiated this lawsuit in 2010. The Windstars at issue are model years 1998½ - 2003. Thus, when this case began, all Class members owned Windstars that were already seven to twelve years old. Like Plaintiff, many may have purchased their Windstars used. While purchasing a Windstar used may be a valid defense to an unjust enrichment claim, that defense may be applicable to the majority of Class members — based on the age of all Class members' vehicles at the start of this lawsuit — and therefore is not unique to Plaintiff's situation. Ford has not presented any data to support the contention that Plaintiff's situation is atypical compared to other Class members. See Marcus, 687 F.3d at 598-99 (plaintiff who did not perform much research on the allegedly defective BMW run-flat tires prior to making his purchase satisfied the typicality requirement because there was no evidence that other class members had knowledge of the alleged defect before buying their vehicles).

Lastly, Plaintiff's interests and incentives are sufficiently aligned with those of the two Classes. He is seeking monetary damages from Ford on behalf of himself and all other current owners of an allegedly defective Ford Windstar. For some Class members, like Plaintiff, damages will consist of repair and replacement costs of a fractured rear axle. For other Class members who have not yet experienced a failure, damages will be based on the alleged diminution of the Windstar's value because of the potential defect highlighted by Ford's safety recall. Consequently, all Class members, including Plaintiff, have allegedly suffered monetary harm because of the Benteler Axle design. Therefore, Plaintiff has satisfied the typicality requirement for the Implied Warranty and Unjust Enrichment Classes.

On the other hand, Plaintiff has not satisfied the typicality requirement for the Express Warranty and Consumer Protection Classes. As explained above, Plaintiff's supplemental brief revised the membership of the Express Warranty and Consumer Protection Classes to include only states that define these causes of action in a similar manner. As part of this revision, Pennsylvania — Plaintiff's home state — was removed from both Classes. The Supreme Court has "repeatedly held that 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982) (citation omitted). Plaintiff is not part of either Class. He has no breach of express warranty or consumer protection claim against Ford. Moreover, because Plaintiff cannot collect damages on these claims, his legal position is markedly different from the legal position of the Express Warranty and Consumer Protection Classes as a whole, and as such his interests are not sufficiently aligned with the proposed Classes. Thus, he has not satisfied the typicality requirement of Rule 23(a)(3) for the Express Warranty and Consumer Protection Classes.[17]

### 4.      Rule 23(a)(4): Plaintiff Is Not An Adequate Representative for All Classes

Like typicality, the adequacy requirement focuses on the class representative's relationship to the class as a whole. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). "The adequacy requirement has two components: (1) . . . the experience and performance of class counsel; and (2) . . . the interests

---

[17] Because the Express Warranty and Consumer Protection Classes do not meet the typicality requirement of Rule 23(a)(3), these classes cannot be certified. See Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 149 (3d Cir. 2008). However, the Court will address the remaining requirements of Rule 23(a) and (b) as to these Classes for the sake of completeness.

and incentives of the representative plaintiffs." Dewey v. Volkswagen Aktiengesellschaft, 681

F.3d 170, 181 (3d Cir. 2012) (citation omitted).

In this case, the first component of the adequacy requirement is not an issue since there

has been no challenge to the experience or performance of Plaintiff's counsel. See, e.g., In re

Schering, 589 F.3d at 602 (finding no analysis necessary where "[n]o issue ha[d] been raised

regarding the adequacy of [Plaintiff]'s counsel for purposes of representing the class.").

As to the second component, "the linchpin of the adequacy requirement is the alignment

of interests and incentives between the representative plaintiffs and the rest of the class." Dewey,

681 F.3d at 183. Thus, "[t]here are clear similarities between the components of the typicality

inquiry relating to the absence of unique defenses and alignment of interests, and this second part

of the adequacy inquiry that focuses on possible conflicts of interest." In re Schering, 589 F.3d

at 602.

"Certain intra-class conflicts may cause the interests of the representative plaintiffs to

diverge from those of the unnamed class members. The adequacy requirement 'is designed to

ferret out' such conflicts of interest." Dewey, 681 F.3d at 183-84 (citation omitted). Specifically,

a named plaintiff is not an adequate representative of unnamed class members where there is a

"fundamental conflict" between the two, that is, a conflict of interest that is material and touches

"the specific issues in controversy." Id. at 184 (citation omitted).

Here, Plaintiff is an adequate representative of the Implied Warranty and Unjust

Enrichment Classes. As explained above, Plaintiff is the current owner of a Ford Windstar with

an allegedly defective rear axle, which is the same axle design that Ford used in manufacturing

all model year Windstars at issue in this case. Plaintiff seeks damages caused by the axle's

defective design. Again, there is no evidence at this stage of the litigation that Plaintiff will be

subject to any unique defenses.  Nor is Plaintiff an inadequate representative of those Class members who have not yet experienced an axle failure, because, as explained above, he is seeking monetary damages, like all proposed Class members, based on the alleged design defect, even though the amount of damages may differ among Class members.  See Dewey, 681 F.3d at 184 (finding plaintiffs who already suffered damage from water leakage due to defectively designed sunroofs were adequate representatives of class members who had not yet experienced leakage because, among other reasons, "[t]o hold that . . . differing valuations [on the appropriate settlement amount] by themselves render the representative plaintiff inadequate would all but eviscerate the class action device").

However, for reasons previously explained, Plaintiff fails to satisfy the adequacy requirement for the Express Warranty and Consumer Protection Classes because he is not — as a resident of Pennsylvania — a member of these Classes.  Plaintiff's interest in pursuing these claims, for which he cannot personally recover damages, is not sufficiently aligned with Class members who actually have valid express warranty and/or consumer protection claims.  See In re Schering, 589 F.3d at 602 (a plaintiff who was potentially barred from recovering certain ERISA benefits would be an inadequate representative of a class pursuing those benefits, because the plaintiff "may have different incentives in terms of how much time, energy, and money she is willing to spend pursing the claim"); Sanneman, 191 F.R.D. at 448 (finding used car owner to be an inadequate representative of a class that — by definition — was comprised solely of new car owners).

In sum, Plaintiff has satisfied the requirements of Rule 23(a) — numerosity, commonality, typicality, and adequacy — for the Implied Warranty and Unjust Enrichment

Classes, but has failed to satisfy all requirements for the Express Warranty and Consumer

Protection Classes.

      **B.**      **Federal Rule of Civil Procedure 23(b)(3): Class Action Seeking Monetary Damages**

In addition to meeting the requirements of Rule 23(a), Plaintiff's proposed Classes must

also satisfy the conditions set forth in Federal Rule of Civil Procedure 23(b)(3).[18]  To maintain a

class action, Rule 23(b)(3) requires:

> the Court [find] that the questions of law or fact common to class members <u>predominate</u> over any questions affecting only individual members, and that a class action is <u>superior</u> to other available methods of fairly and efficiently adjudicating the controversy.

<u>Id.</u> (emphasis added).  "The twin requirements of Rule 23(b)(3) are known as predominance and

superiority."  <u>In re Hydrogen Peroxide</u>, 552 F.3d at 310.  Predominance "tests whether proposed

classes are sufficiently cohesive to warrant adjudication by representation, a standard far more

demanding than the commonality requirement of Rule 23(a), requiring more than a common

claim."  <u>Id.</u> at 311 (internal citations and quotation marks omitted).[19]

"To assess predominance, a court at the certification stage must examine each element of

a legal claim 'through the prism' of Rule 23(b)(3)."  <u>Marcus</u>, 687 F.3d at 600 (citation omitted).

"A plaintiff must 'demonstrate that the element[s] of [a legal claim] [are] capable of proof at trial

through evidence that is common to the class rather than individual to its members.'"  <u>Id.</u>

(citation omitted).  Furthermore, "a district court must formulate some predication as to how

specific issues will play out in order to determine whether common or individual issues

---

[18] As noted above, class certification is precluded for the Express Warranty and Consumer Protection Classes for failure to satisfy all of Rule 23(a)'s requirements.  Nevertheless, the Court will perform a Rule 23(b)(3) analysis on all proposed Classes.

[19] Because the Court ultimately concludes that Plaintiff's proposed Classes do not meet the predominance requirement, the superiority prong will be discussed to a lesser extent.

predominate in a given case."  Id. (quotation marks and citation omitted).  "'If proof of the

essential elements of the cause of action requires individual treatment, then class certification is

unsuitable.'"  In re Hydrogen Peroxide, 552 F.3d at 311 (citation omitted).

Failure to satisfy the predominance requirement, especially in automotive defect cases,

has often been the reason courts have denied class certification.  See Marcus, 687 F.3d at 604

("Other federal courts have also recognized that suits alleging defects 'involving motor vehicles

often involve complicated issues of individual causation that predominate over common

questions regarding the existence of a defect.'") (citation omitted); see also In re Ford Motor Co.

E-350 Van Prod. Liab. Litig. (No. II), No. 03-4558, 2012 WL 379944, at *1, 22 (D.N.J. Feb. 6,

2012) (denying certification of class comprised of Ford 15-passenger vans "designed [with] a

high center of gravity that leads to an unusually high rollover rate," because, among other

reasons, a breach of implied warranty claim under New York law requires proof of an "actual

injury," that is, "personal or property damage, out-of-pocket repair costs, or sale at a loss," which

would require the court "to unearth the viable claims via individual inquiries").

Here, Plaintiff has similarly failed to demonstrate that common issues predominate over

individual ones for each of the four proposed Classes as required by Rule 23(b)(3).[20]  The Court

will discuss this impediment as it applies to each proposed Class.

_____

[20] In their briefs the parties cite about twenty federal cases in which plaintiffs sought class
certification for claims of defective auto parts.  It is noteworthy that — except for class
certifications for settlement purposes only and a 1986 Western District of North Carolina case —
the remaining cases did not involve claims of a defective auto part in which a multi-state breach
of warranty and/or consumer protection law class was certified.

In addition, Plaintiff contends in the introduction to his Motion for Class Certification that this
case "strongly resembles class actions certified" in Daffin v. Ford Motor Co., 458 F.3d 549 (6th
Cir. 2006), Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168 (9th Cir. 2010), and Hanlon
v. Chrysler Corp., 150 F.3d 1011 (9th Cir. 1998).  The legal and factual positions of the plaintiffs
in those cases were different from the instant case.  In Daffin, 458 F.3d at 550, and in Wolin, 617

### 1.    Express Warranty Class: Common Issues of Fact Do Not Predominate

Plaintiff contends that "Ford created an express warranty that the Ford Windstar minivans were free from defects in material and workmanship through the warranty booklet that accompanied the sale of every Windstar minivan," and that it breached the warranty by failing to disclose that the Benteler Axle was prone to fracture due to metal fatigue.  (Doc. No. 83 at 7-8.) Express Warranty Class members allegedly suffered damages by either paying for repair and replacement of fractured axles or from the Windstar's loss of value because the vehicle was manufactured with a faulty rear axle.  The Class is comprised of current owners from twenty-three states and the District of Columbia.

Plaintiff has provided the Court with a citation to the express warranty statute for each state.  They are nearly identical to express warranty provisions of the Uniform Commercial Code ("UCC").[21]  Plaintiff selected this group of twenty-three states because he contends that the

---

F.3d at 1170-76, the courts certified single-state classes comprised of vehicle owners whose vehicles were still covered by the terms of the manufacturer's original warranty.  Hanlon involved a class certification for settlement purposes only.  150 F.3d at 1017.  This case, on the other hand, involves one named Plaintiff attempting to litigate claims on behalf of vehicle owners from across the country, concerning an alleged defect in vehicles that are seven to twelve years old.

[21] UCC § 2-313 states:

> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> . . . .

express warranty law in these states, unlike others, does not require proof that a Class member relied on the statements of Ford when purchasing a Windstar or that each Class member is required to notify Ford of the alleged breach prior to the filing of this lawsuit.[22]  Furthermore, he claims these twenty-three states have "been expressly approved for class certification . . . in factually similar product defect cases."  (Doc. No. 83 at 4 (citing Allen v. Am. Honda Motor Co., 264 F.R.D. 412, 429-30 (N.D. Ill. 2009), vacated, 600 F.3d 813 (7th Cir. 2010), and Barden v. Hurd Millwork Co., 249 F.R.D. 316, 321 (E.D. Wis. 2008).)

The Court is not persuaded, however, that the law of all twenty-three states is sufficiently similar to be capable of classwide application at trial.  First, the court decisions in Allen and Barden are not persuasive authority for the position advanced by Plaintiff.  In Allen, the district court did certify a class consisting of the same twenty-three states proposed by Plaintiff, explaining that "[t]hough the court will be called upon to address the laws of multiple jurisdictions, the laws are similar enough that the case will be manageable."  264 F.R.D. at 430.

---

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty. . . .

[22] Reliance and pre-litigation notice are two elements that often preclude certification of multi-state breach of express warranty classes.  "To create an express warranty under UCC § 2-313, an 'affirmation of fact or promise' or a 'description of the goods' by the seller must be part of the 'basis of the bargain.'  There is a clear split of authority . . . as to whether a buyer must show reliance on a statement . . . for it to be considered part of the 'basis of the bargain.'"  Cole v. Gen. Motors Corp., 484 F.3d 717, 726 (5th Cir. 2007).  Thus, "certain jurisdictions' requirement that plaintiffs show reliance as a condition for recovery greatly impacts the predominance inquiry: 'the economics ordinarily associated with the class action device' are defeated where plaintiffs are required to bring forth individual proof of reliance."  Id. at 727 (citation omitted).

As for pre-litigation notice, Section 2-607 of the UCC requires buyers to notify sellers of their warranty claims "within a reasonable time," but "[s]tate law varies in what constitutes reasonable notice and to whom notice should be given, and other courts considering the issue in the class certification context have noted that these variations impact predominance."  Id.

However, as Ford correctly argues, the Seventh Circuit vacated the district court's order certifying the class, albeit for reasons unrelated to predominance of common legal questions, and the district court did not issue any further opinions addressing class certification on remand.  See Am. Honda Motor Co., Inc. v . Allen, 600 F.3d 813 (7th Cir. 2010).  Thus, reliance on Allen rests on unstable ground.  As for Barden, the class certified does not include all the states that are part of the Express Warranty Class proposed in this case.  See Barden, 249 F.R.D. at 322.  Moreover, although New York was included in the Barden class, as it is in this case, the Court does not agree, for reasons stated below, that New York breach of warranty law is sufficiently similar to the law in other states in the proposed Class.

Second, at least three of the twenty-three states included in the Class contain material differences in their legal definition of a breach of express warranty claim.  Florida, New York, and Oklahoma all require — despite Plaintiff's assertion to the contrary — that a buyer show reliance on a statement or representation made by the seller as condition for recovery on a breach of express warranty claim.  See Royal Typewriter Co., a Div. of Litton Bus. Sys., Inc. v. Xerographic Supplies Corp., 719 F.2d 1092, 1101 (11th Cir. 1983) (under Florida law "absence of reliance will negate the existence of an express warranty"); CBS Inc. v. Ziff-Davis Pub. Co., 75 N.Y.2d 496, 452-53 (1990) ("The critical question [regarding the reliance requirement] is not whether the buyer believed in the truth of the warranted information . . . but 'whether [it] believed [it] was purchasing the [seller's] promise [as to its truth.'") (citation omitted);[23]

---

[23] Plaintiff relies upon this case to support his argument that reliance is no longer a required element of a breach of express warranty claim under New York law.  The Court disagrees with Plaintiff's interpretation of CBS Inc.  New York has not explicitly abandoned the reliance requirement.  Rather, the critical holding in CBS Inc., which is quoted above, shows that a buyer must have knowledge of the facts expressly warranted by a seller before a claim can be made that the seller breached the warranty.  Thus, for purposes of this class action, at least some inquiry must be made into the circumstances surrounding each class member's vehicle purchase.

Alexander v. Smith & Nephew, P.L.C., 98 F. Supp. 2d 1310, 1321-22 (N.D. Okla. 2000)

("Plaintiff's claim for breach of express warranty fails, because [p]laintiff has submitted no

evidence that [he] relied on any of [d]efendant's representations.") (citing Speed Fastners, Inc. v.

Newsom, 382 F.2d 395, 397 (10th Cir. 1967)).[24]  To demonstrate reliance would therefore require

an inquiry into the history of the Windstar purchases by Class members in Florida, New York,

and Oklahoma.

Moreover, New York does not permit recovery of damages unless the alleged defective

part has malfunctioned or failed.  A loss in resale value alone due to an allegedly defective part is

not legally sufficient to state a claim for breach of express warranty.  See Weaver v. Chrysler

Corp., 172 F.R.D. 96, 99 (S.D.N.Y. 1997) (dismissing breach of warranty claim because where

"a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies").

In this case, the majority of Ford Windstar owners have not experienced an axle failure.  Of the

308,700 Windstars that Ford inspected during its safety recall, cracks in the rear axle were only

observed in approximately 16.8% of the vehicles.  Assuming this percentage is nearly

representative of Windstar owners in each state, the only damages that 83.2% of Windstar

owners in New York have suffered would be the alleged loss in the resale value of their vehicles,

---

[24] Plaintiff cites Collins Radio Co. of Dallas, Tex. v. Bell, 623 P.2d 1039 (Okla. Civ. App. 1980), to support the claim that Oklahoma law no longer requires proof of reliance.  But the Collins court did not explicitly hold that the reliance requirement had been dropped.  See Collins, 623 P.2d at 1053.  As demonstrated by the Alexander case cited above, and also noted in the official comments to the Oklahoma Commercial Code, Oklahoma law arguably still requires a plaintiff to show reliance to prove breach of express warranty.  See Okla. Stat. Ann. tit. 12A, § 2-313 cmt. 1(a) and (2) (quoting Woolsey v. Zieglar, 123 P. 164 (Okla. 1912) ("Any direct and positive affirmation of a matter of fact . . . made by the seller during the sale negotiations . . . and actually, to some extent at least, relied upon by the [purchaser] in making the purchase, will be deemed to be a warranty.")).

which, under New York law, is legally insufficient to sustain a claim for breach of express warranty.

More importantly, however, even if the three states listed above were excluded from the Express Warranty Class, proving a breach of an express warranty and damages would lead to individual factual inquiries predominating over common questions of fact. This would preclude this Court from certifying the Express Warranty Class under Rule 23(b)(3).

Proving breach — whether Windstars were sold with a defective rear axle — is central to Plaintiff's claim. Proof of this claim does involve common questions of fact, as noted above in the Rule 23(a)(2) commonality analysis. For example, the same Benteler Axle design was used on all Ford Windstars manufactured from September 1997 through March 2003. This axle consistently failed Ford's revised driveway event test. The failure was caused by metal fatigue, a problem that the A.O. Smith axle and the Toyota Sienna axle did not have when subjected to the same driveway event test. Internally, Ford discussed alternative axle designs, monitored the Benteler Axle's performance in the field, and ultimately replaced it in the model year 2004 vehicle with an axle manufactured by another company. Windstar owners were not made aware of any possible problems with the Benteler Axle until the safety recall was announced in 2010.[25]

---

[25] The Court notes that the NHTSA investigation, which led to the recall, is not in itself proof of a defective product. Furthermore, the ramifications of Ford's decision not to take corrective action prior to the 2010 safety recall — except for heat treatment during the last months of the Benteler Axle's production life — would ultimately be an issue for the jury. At the class certification hearing, defense counsel explained:

> [The Benteler Axle was] perfectly suitable to put out on the road in 1997 [before the driveway test was revised] but Ford decides to increase the durability standard and some of these axles fracture, they didn't quite get there.
> . . . .

Nevertheless, breach cannot be proven without also inquiring into each individual Class member's Windstar experience, since the vast majority of Class members — approximately 83.2% — have not experienced any problems with their rear axles seven to twelve years after their vehicles were manufactured.  In deciding whether Ford breached the express warranty that Windstars were "free from defects in material and workmanship," a trier-of-fact cannot solely look at evidence of Ford's knowledge of the rear axle issues from 1997 through 2003, but must also consider how each axle performed through 2010.  (See Doc. No. 83 at 7.)[26]

For example, a Class member might own a 1998 Ford Windstar with 160,000 miles, which has been driven daily for twelve years without a problem.  A second Class member may

---

Ford was monitoring what is called the complaint data; had anyone complained about any problem with a Windstar — so Ford knowing what it knew at the time said people are driving these things, they have high mileage, and no one's experiencing any problem.  We raised our hurdle much higher, we increased the severity of our test by over forty percent.  We've had some fractures in our testing but we don't think it's an issue in the field.

. . . .

But as I said, what Ford had not considered was the effect of corrosion. So that's why Ford had to conduct a recall [in August 2010]; not because of anything it did or did not do back in the 1990s, but because we learned in 2010 that there was a different element in play, severe corrosion that was combining with the fatigue stress to cause these axles to fail.

. . . .

[I]f . . . this case goes forward, [whether Ford should have acted differently] could be a jury issue.

(Mot. Class Cert. Hr'g 72:1-4, 74:23-75:5, 72:12-17, 72:25-73:1, June 4, 2012.)

[26] Ford argues that the Model Warranty Guide does not expressly warrant, as Plaintiff claims, that Windstars would be "free from defects," but rather, the Guide simply provides for free repair and replacement if parts malfunction within the specified time frame.  Because the Court finds that common issues of fact do not predominate — even assuming Plaintiff's broader reading of the Model Warranty Guide is correct — the Court does not need to address Ford's argument on the proper scope of the Model Warranty Guide.

have used his 2000 Windstar to travel constantly for business, putting 200,000 miles on the vehicle.  A third Class member may have only 50,000 miles on a 2003 Windstar because the Class member drives the vehicle only on weekends.  A fourth Class member may have been forced to replace his original Benteler Axle after only three months of use because of a serious rear-end collision.  None of these Class members suffered an axle fracture.  Are these vehicles of different ages, with different mileage, in different conditions, which have been driven without a problem "free from defects"?  These matters cannot be addressed by a trier-of-fact without consideration of the individual factual scenarios.

Even assuming breach could be proven on a classwide basis, the calculation of damages for Express Warranty Class members is "nearly impossible . . . without individualized inquiries into each claim."  See Muehlbauer v. Gen. Motors Corp., No. 05-2676, 2009 WL 874511, at *7 (N.D. Ill. Mar. 31, 2009).  The Supreme Court recently held in Comcast Corp. v. Behrend that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the] theory [of the case].  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  133 S. Ct. 1426, 1433 (2013).

The typical "measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted . . . ."  See, e.g., Colo. Rev. Stat. Ann. § 4-2-714(2); Spring Motors Distribs., Inc. v. Ford Motor Co., 489 A.2d 660, 665 (N.J. 1985) ("A direct economic loss [for breach of warranty] includes the loss of the benefit of the bargain, i.e., the difference between the value of the product as represented and its value in its defective condition.").

Here, the rear axles on approximately 83.2% of the Windstars at issue have not malfunctioned.  For these owners, Plaintiff proposes that damages can be measured based on the loss in the Windstar's resale price after the public became aware of the defectively designed axle because of Ford's safety recall.  Specifically, Plaintiff's expert, an economist, states:

> To the extent that the defective rear axle design of Model Year 1998[½] to 2003 Windstars is well known, resale prices of [those] Windstars should reflect the reduced useful lives of these vehicles.  Therefore, differences in resale prices for otherwise similar vehicles of the same age from different production vintages captures the reduction in resale price that is due to the defective axle design.

(Doc. No. 62, Ex. 5 (Declaration of Albert J. Lee Concerning Calculation of the Economic Impact of Rear Axle Issues with Ford Windstar).)

The Court is not persuaded that this damages model is sufficient for class certification purposes.  The resale price of a used Windstar is based on a multitude of factors, of which the allegedly defective rear axle is but one.  See, e.g., Carpenter v. BMW of N. Am., Inc., No. 99-214, 1999 WL 415390, at *4 (E.D. Pa. June 21, 1999) ("'[T]he value of [a] vehicle[ ] is dependent on a whole host of individualized factors including age, mileage, repair and maintenance history and accidents or damage.'") (quoting Chin v. Chrysler Corp., 182 F.R.D. 448, 463 (D.N.J. 1998)).  The need to take into account this multitude of factors creates a proximate cause issue similar to one addressed by the Third Circuit in Marcus v. BMW of N. Am., LLC, 687 F.3d 583 (3d Cir. 2012).

In Marcus, the plaintiff had leased a BMW equipped with allegedly defective Bridgestone run-flat tires ("RFT").  687 F.3d at 588.  "As their name suggests, [the RFTs] can 'run' while 'flat.'  Even if an RFT suffers a total and abrupt loss of air pressure from a puncture or other road damage, the vehicle it is on remains stable and can continue driving for 50 to 150 miles at a speed of up to 50 miles per hour."  Id.  After having numerous problems with his RFTs, plaintiff

brought a class action against BMW and Bridgestone claiming breach of warranty, breach of contract, and consumer protection violations.  Id.  He sought certification for a class consisting of "[a]ll current and former owners and lessees of [certain model year] BMW vehicles equipped with run-flat tires manufactured by Bridgestone . . . whose [t]ires have gone flat and been replaced."  Id. at 590.

The district court certified the class, but the Third Circuit reversed.  Among other reasons, the Third Circuit found that, even assuming that the plaintiff could show a common, classwide defect, he could not show "without resort to individual proofs, that this defect caused the class members' damages."  Id. at 603.  Specifically, the court noted that a "tire can 'go flat' for myriad reasons. . . . Even 'defective' tires can go flat for reasons completely unrelated to their defects." Id. at 604.  Thus, "to determine why a particular class member's Bridgestone RFT has 'gone flat and been replaced' requires an individual examination of that class member's tire," and such individual inquires defeat the predominance requirement of Rule 23(b)(3).  Id. (citing Oscar v. BMW of N. Am., LLC, 274 F.R.D. 498, 511 (S.D.N.Y. 2011); Chin, 182 F.R.D. at 455).

In this case, although identifying the precise cause of a rear axle fracture in the vehicle of 16.8% of Class members is not problematic, linking a decrease in resale value specifically to the announcement of Ford's safety recall raises the same proximate cause obstacle noted in Marcus. For example, when this lawsuit began, all Class members' vehicles were seven to twelve years old.  Some may have had 100,000 miles, others may have had 200,000 miles.  A number of Class members may have kept the interior of their vehicle in pristine condition, whereas others may not have.  It is also possible that a number of Windstars, such as Plaintiff's, have been in auto accidents requiring repair and replacement of various parts, including rear axles.  All of these considerations, among others, must be taken into account when comparing "similar vehicles of

the same age" to "capture[ ] the reduction in resale price that is due to the defective axle design."

(See Doc. No. 62, Ex. 5.)  On an owner-by-owner basis, such a calculation may be possible, but

this methodology cannot be used to accurately determine damages on a classwide basis.[27]  Thus,

---

[27] Plaintiff's expert, Dr. Albert Lee, acknowledged during his deposition that different factors, such as vehicle age, would have to be taken into consideration when preparing an economic model on damages.  Dr. Lee has provided little detail, however, to demonstrate how such an economic model would actually operate in this case.  (See Doc. No. 67, Ex. P.)  At this stage of the litigation, Dr. Lee's analysis is still theoretical:

> Defense counsel: You were asked to outline a methodology to quantify the economic impact to the class using statistical and economic techniques or methods?
>
> Dr. Lee: Yes, that's right.
>
> Defense counsel: And I take it that you have explored that, but you have not actually done that yet?  You have not done any quantification yet?
>
> Dr. Lee: I have not done any quantification.  No.  This is a think piece, so to speak.
>
> Defense counsel: A think piece?
>
> Dr. Lee: Yes.

(Id. at 4.)  A "think piece" is defined as "a piece of writing meant to be thought-provoking and speculative that consists chiefly of background material and personal opinion and analysis." Merriam-Webster's Collegiate Dictionary 1299 (11th ed. 2003).  Additionally, Dr. Lee has not yet developed a method that would enable the proper distribution of an award of damages to each individual class member:

> Defense counsel: You've described your [Declaration . . . Concerning Calculation of the Economic Impact of Rear Axle Issues with Ford Windstar] as a think piece and I have kind of a big picture question about it.  As I read Part 4 [Overview of Methodology] of your Declaration, you talk about the economic impact to the class, and my question is this: Do you have any plan methodology for determining individual damages to individual class members?
>
> Dr. Lee: No.

39

Plaintiff has not provided the Court with a method to calculate damages for the entire Class that is specifically linked to Ford's alleged breach of the express warranty.

In sum, the Court will deny Plaintiff's Motion to Certify the Express Warranty Class for failure to satisfy the typicality and adequacy requirements of Rule 23(a), because, as explained above, Plaintiff is not a member of this Class as a Pennsylvania resident, and he is not able to meet the predominance requirement of Rule 23(b)(3) due to individual questions of fact concerning the breach of the express warranty and the calculation of damages.

### 2.   Implied Warranty Class: Common Issues of Fact Do Not Predominate

Plaintiff claims that "Ford created an implied warranty that the Ford Windstar minivans were merchantable and fit for ordinary purposes," and Ford breached the warranty by selling the vehicles with defective rear axles.  (Doc. No. 83 at 9.)  Like the Express Warranty Class, Plaintiff claims that Windstar owners in the Implied Warranty Class allegedly suffered damages from repair and replacement costs or a loss in resale value.  The Implied Warranty Class is comprised of owners from twelve states and the District of Columbia.

Plaintiff has provided the Court with a citation to each state's implied warranty statute, which contains UCC language,[28] and examples of common facts necessary to prove a breach of implied warranty.  Plaintiff contends these twelve states do not require, unlike other states, proof

---

(Id. at 7.)

[28] UCC § 2-314 states:

> [A] warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . . [For] [g]oods to be merchantable [they] must be at least such as . . . are fit for the ordinary purposes for which such goods are used. . . .

of privity, which would have prevented used Windstar owners from asserting claims of breach of an implied warranty against Ford.

Despite the states' shared legal definition of breach of implied warranty, the Implied Warranty Class cannot be certified because individual issues of fact regarding breach and the calculation of damages would predominate.[29]

Proving breach — that the Ford Windstars were not "fit for the ordinary purposes for which such goods are used" — is a question of fact.  See, e.g., Kruger v. Subaru of Am., Inc., 996 F. Supp. 451, 454 (E.D. Pa. 1998) (citing Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d Cir. 1992)).  Facts relevant to this inquiry include not only Ford's testing and monitoring of the Benteler Axle but, as stated above in discussing the Express Warranty Class analysis, the experience of each individual Class member with the Ford Windstar.

For example, Plaintiff's 2001 Ford Windstar had approximately 80,000 to 100,000 miles when the rear axle fractured in 2010.  Is a nine-year old Windstar "fit for the ordinary purposes" for which a Windstar is used when its rear axle cracks after approximately 80,000 miles?  What

---

[29] The law of these twelve states appears to be sufficiently similar for classwide application, but even this proposition is debatable.  For example, several courts interpreting New Jersey law have held there is no legally cognizable claim for a defective product where the product has not malfunctioned or failed.  See, e.g., Yost v. Gen. Motors Corp., 651 F. Supp. 656, 657-58 (D.N.J. 1986) (dismissing breach of warranty claim for failure to plead damages because "all [plaintiff] is able to allege is that the potential leak [in his Cadillac engine] is 'likely' to cause damage and 'may' create potential safety hazards"); Thiedemann v. Mercedes-Benz USA, LLC, 872 A.2d 783, 795 (N.J. 2005) (granting summary judgment on consumer fraud claim because the "argument . . . that there is a future hypothetical diminution in value in the [Mercedes] E-320 due to a fuel gauge that at one time did not read properly a full tank of gasoline, is too speculative to satisfy the . . . requirement of a demonstration of a quantifiable or otherwise measurable loss").  Not all courts agree, however, with this interpretation of the law.  See In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II), No. 03-4558, 2008 WL 4126264, at *16 (D.N.J. Sept. 2, 2008) (denying motion to dismiss breach of warranty claim because "the Supreme Court of New Jersey certainly did not foreclose entirely the use of 'diminution in value' as a form of ascertainable loss").  Because individual issues of fact prevent certification, the Court does not have to decide whether New Jersey is properly included in the Implied Warranty Class.

if a Class member drove his 1998 Windstar for twelve years before experiencing a fracture? Three additional years of problem-free driving should be taken into consideration by the trier-of-fact when determining fitness for ordinary purposes. Moreover, most Class members had no issues with their rear axles. Is a twelve-year old Windstar with no visible cracks in its rear axle unfit for ordinary usage because the rear axle may one day malfunction? These questions cannot be answered by the trier-of-fact without examining individual circumstances. Thus, it is evident that common questions of fact do not predominate as required by Rule 23(b)(3).

Even if breach could be proven by using only common facts, the calculation of damages for the Implied Warranty Class would face the exact same obstacles as the Express Warranty Class. Again, approximately 83.2% of Windstar owners have not experienced any problems with their rear axles. Plaintiff claims that these Class members suffered damages through a reduction in the resale value of their vehicles after the safety recall was initiated. As explained above, assuming the recall did affect the market price for used Windstars, Plaintiff has not provided a method to calculate the decrease in value on a classwide basis.

Assume, for example, that the selling price of a 1998 Windstar with 150,000 miles prior to the recall was $3,000, and that same model year with 100,000 miles was selling for $3,300. Would the recall announcement really affect the selling price of a twelve-year old Windstar? If so, would the decrease in price be the same for vehicles with different mileage? Would the change in price differ when comparing a 1998 Windstar with a 2003 Windstar? These questions cannot be answered on a classwide basis.[30]

---

[30] Ford's safety recall creates an additional hurdle for a classwide award of damages. While the recall itself does not, as a matter of law, preclude Windstar owners from filing suit against Ford for monetary damages, it does complicate the issue. Because of the recall, some Windstar owners received rear axle support brackets, others had their axles replaced, and some even had their vehicles repurchased by Ford. The value of these remedies must be taken into

Therefore, the Court will deny Plaintiff's Motion to Certify the Implied Warranty Class for failure to satisfy the requirement of Rule 23(b)(3) because of the predominance of individual questions of fact concerning breach and the calculation of damages.

### 3.     Consumer Protection Class: Common Issues of Fact Do Not Predominate

The proposed Consumer Protection Class is comprised of Ford Windstar owners from twenty-two states and the District of Columbia.  These particular venues were chosen by Plaintiff because, unlike other states, their consumer protection laws do not prohibit class actions, do not require individualized reliance or require pre-litigation notice, all of which would have been problematic for class certification purposes.  Plaintiff claims that Ford violated each state's consumer protection statute by failing to disclose to Class members material information about the Ford Windstar's rear axle, namely, that the axle was potentially subject to premature cracking caused by metal fatigue.

To prove a consumer protection violation, Plaintiff is required to demonstrate:  (1) Ford's "omission or concealment of a material fact," and (2) "as a result of" the concealment or omission class members suffered an "ascertainable loss."  See, e.g., Marcus, 687 F.3d at 605 (citing the  New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, 8-19); Gavin v. AT&T Corp., 543 F. Supp. 2d 885, 909 (N.D. Ill. 2008) (citing the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 et seq.).

Plaintiff acknowledges that twelve of the twenty-two states also require proof that Ford "knowingly" or "intentionally" concealed or omitted the material facts.  (See Doc. No. 83-3 (citing, among others, Colo. Rev. Stat. § 6-1-105(1)(u); Idaho Code Ann. § 48-603; N.M. Stat.

---

consideration when awarding monetary damages to each Class member.  If not, an award from this lawsuit may overcompensate certain Class members.

§ 57-12-2D).)  He contends that proof of scienter in some states does not present a predominance

problem, and cites In re Pharmaceutical Industry Average Wholesale Price Litigation, 252 F.R.D.

83, 99-100 (D. Mass. 2008), in support of this position.

 In In re Pharmaceutical Industry Average, the district court noted that the consumer

protection statutes of Idaho, Kansas, Nevada, New Mexico, South Dakota, and Wyoming all

require proof that a defendant "behaved knowingly, intentionally or willfully."  252 F.R.D. at 99

n.19 (citations omitted).  For class certification purposes, the court concluded that "the varying

standards governing a defendant's scienter [did] not pose insuperable management issues

because the Court [could] ask the jury specific questions geared to the [consumer protection

statutes] discussed above."  Id. at 100.

 The consumer protection claims in In re Pharmaceutical Industry Average were not based

on an omission or concealment of material facts, as in the instant case, but rather, affirmative

misrepresentations of fact made by the defendants.  See id.  Based on this difference, Ford

argues that the reasoning of the court in In re Pharmaceutical Industry Average is inapplicable to

the facts of this case.  While Ford correctly points out that In re Pharmaceutical Industry Average

was not an omissions case, this distinction is not material to the predominance analysis.  Like In

re Pharmaceutical Industry Average, this Court without difficulty can pose questions for the trier-

of-fact that specifically address whether Ford "knowingly" or "intentionally" concealed or

omitted information about the Windstar's rear axle problems.

 The Court does agree with Ford, however, that the Kansas Consumer Protection Act is

materially different from the law of the other states included in the Consumer Protection Class.

Under Kansas law, consumers can bring suit against violators of various provisions of the Act,

but the definition of "consumer" is limited to the following:

> an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes.

Kan. Stat. Ann. § 50-624(b).  This definition excludes corporations and other business organizations.  See Kestrel Holdings I, L.L.C. v. Learjet Inc., 316 F. Supp. 2d 1071, 1076-77 (D. Kan. 2004) ("'[A] corporation or similar entity that has suffered an injury as a result of a 'deceptive' or 'unconscionable' act or practice cannot assert a claim under the KCPA.'") (citation omitted).

In this case, the proposed Class includes, among others, all current Windstar owners and leasees registered in Kansas.  The only business entities that can bring suit under the Kansas Consumer Protection Act are those organized as sole proprietors or family partnerships.  Corporations, limited liability companies, and non-family partnerships, for example, are precluded from filing suit under the Act.  This limited definition of "consumer" under Kansas law presents a problem for class certification purposes.  Some Kansas Windstar owners will be able to maintain the instant action against Ford, while others will not.  Determining which registered Windstar owners fall within the acceptable definition of "consumer" will likely involve individual inquiries, since a family partnership, for example, may not be distinguishable from a non-family partnership based solely on the name of the business.

However, even if Kansas Class members were excluded and special jury instructions were provided on scienter, the Consumer Protection Class fails to satisfy the requirements of Rule 23(b)(3) because individual issues of fact predominate.  Specifically, to determine whether a Class member suffered an "ascertainable loss," and whether that loss was "as a result of" Ford's concealment or omission of information regarding the Windstar's rear axle, requires the trier-of-fact to consider facts unique to each individual Class member.

45

Plaintiff will encounter the same insurmountable obstacles in his attempt to prove a classwide "ascertainable loss" suffered "as a result of" Ford's conduct as he would encounter attempting to prove classwide damages for the Express and Implied Warranty Classes discussed above.  Simply put, for a Class member whose rear axle has not fractured — which is the majority of Class members — proving a used Windstar suffered a loss in value because of Ford's safety recall requires an inquiry into the age, mileage, and condition of the vehicle.  This individual fact-gathering process is essential to a consumer protection claim, and therefore fatal to the predominance requirement for class certification under Rule 23(b)(3).

In sum, the Court will deny Plaintiff's Motion to Certify the Consumer Protection Class for failure to satisfy the typicality and adequacy requirements of Rule 23(a), because, as explained above, Plaintiff is not a member of this Class as a Pennsylvania resident, and the predominance requirement of Rule 23(b)(3) is not met due to individual questions of fact concerning "ascertainable loss" and whether the loss was "as a result of" Ford's alleged concealment and omission of material information.

### 4.     Unjust Enrichment Class: Common Issues of Fact Do Not Predominate

The Unjust Enrichment Class is based on the same underlying facts as the Express and Implied Warranty Classes.  Plaintiff proposes a nationwide Class based on each state's adoption of a nearly identical version of Restatement (First) of Restitution § 1, which provides that a "person who has been unjustly enriched at the expense of another is required to make restitution to the other."

Proving unjust enrichment requires a plaintiff to demonstrate that:  (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant appreciated the benefit, and (3) the defendant accepted the benefit under such circumstances as to make non-payment inequitable.

46

See, e.g., Crown Coal & Coke Co. v. Compass Point Res., LLC, No. 07-1208, 2009 WL

1806659, at * 4 (W.D. Pa. June 23, 2009) (citing Schenck v. K.E. David, Ltd., 666 A.2d 327, 328

(Pa. Super. Ct. 1995)).

     Because the Court finds that common issues of fact do not predominate for the Unjust

Enrichment Class, the Court will not decide the issue of whether differences in the legal concept

of unjust enrichment predominate.  The Court will, however, briefly address the differences to

show that a multi-state claim for unjust enrichment is not a bright-line proposition.  Some courts

have found the law of unjust enrichment across the country to be sufficiently similar for class

certification purposes and some courts have not so found.  For example, the district court in In re

Mercedes-Benz Tele Aid Contract Litigation, 257 F.R.D. 46, 58 (D.N.J. 2009), cited by Plaintiff

in support of a nationwide Unjust Enrichment Class, explained that:

> [w]hile there are minor variations in the elements of unjust enrichment
> under the laws of the various states, those differences are not material
> and do not create an actual conflict.  Agostino v. Quest Diagnostics, Inc.,
> 256 F.R.D. 437, 463-64, 2009 WL 348898 at *22 (D.N.J. 2009).    As
> was recently explained by the United States District Court for the
> Eastern District of Pennsylvania:
>
>> Although there are numerous permutations of the elements of the
>> [unjust enrichment] cause of action in the various states, there are
>> few real differences.   In all states, the focus on an unjust
>> enrichment claim is whether the defendant was unjustly enriched.
>> At the core of each state's law are two fundamental elements —
>> the defendant received a benefit from the plaintiff and it would be
>> inequitable for the defendant to retain that benefit without
>> compensating the plaintiff.  The focus of the inquiry is the same in
>> each state . . . .  Powers v. Lycoming Engines, 245 F.R.D. 226, 231
>> (E.D. Pa. 2007) (emphasis in original), rev'd on other grounds,
>> 2009 WL 826842, 328 Fed. Appx. 121 (3d Cir. 2009).

In re Mercedes-Benz Tele Aid, 257 F.R.D. at 58; see also Schumacher v. Tyson Fresh Meats,

Inc., 221 F.R.D. 605, 612 (D.S.D. 2004) ("In looking at claims for unjust enrichment, we must

keep in mind that the very nature of such claims requires a focus on the gains of the defendants,

not the losses of the plaintiffs.  That is a universal thread throughout all common law causes of action for unjust enrichment.").

Other courts, while acknowledging the "fundamental elements," have reached the opposite conclusion when analyzing the so-called "minor variations" in unjust enrichment law. For instance, the district court in <u>Muehlbauer v. General Motors Corp.</u>, No. 05-2676, 2009 WL 874511, at *6 (N.D. Ill. Mar. 31, 2009) — relied on by Ford to demonstrate the difficulties of attempting to litigate unjust enrichment using the law of multiple jurisdictions — denied certification of a thirty-eight state unjust enrichment class because, among other reasons, common legal issues lacked predominance.  The court explained that "California, Hawaii, Missouri and New York require that there be no adequate remedy at law before allowing a plaintiff to proceed with an unjust enrichment claim."  <u>Id.</u> at *5 (citing <u>Ramona Manor Convalescent Hosp. v. Care Enters.</u>, 225 Cal. Rptr. 120 (Cal. Ct. App. 1986); <u>Porter v. Hu</u>, 169 P.3d 994 (Haw. Ct. App. 2007); <u>Bennett v. Crane</u>, 289 S.W. 26 (Mo. Ct. App. 1926); <u>Featherstonhaugh v. Roemer</u>, 279 A.D. 2d 783 (N.Y. App. Div. 2001)).  The court noted that to hold a defendant liable for unjust enrichment under Minnesota law "'requires that the defendant be 'unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully.'" <u>Id.</u> at *6 (quoting <u>ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.</u>, 544 N.W. 2d 302, 306 (Minn. 1996)).  In Virginia, unjust enrichment is limited to claims "'arising from: money paid by mistake; failed consideration; money got through imposition; extortion; oppression; or any other undue advantage taken of the claiming party's situation, where the advantage is contrary to laws made for the protection of persons under those circumstances.'"  <u>Id.</u> (quoting <u>Qualichem, Inc. v. Xelera, Inc.</u>, No. 01-134, 2003 WL 23162331, at *3 (Va. Cir. Ct. June 19, 2003)).  Wisconsin, on

the other hand, "has no such requirement of unlawfulness." Id. (citing Ludyjan v. Cont'l Cas. Co., 747 N.W.2d 745 (Wis. Ct. App. 2008)).

The Muehlbauer court concluded that "if plaintiffs had looked deeper than the general elements, they would have discovered that there are differences among the states with regard to unjust enrichment that preclude class treatment. . . . The nuances of state law in this area are simply too varied." Id.; see also Thompson v. Bayer Corp., No. 07-17, 2009 WL 362982, at *4-6 (E.D. Ark. Feb. 12, 2009) (denying unjust enrichment class certification because states differ on wrongful conduct, direct versus indirect purchaser, and adequate remedy at law requirements necessary to prove claim).

These cases have been accurately cited by Plaintiff and Ford to support their respective positions. The reason district courts have reached different conclusions regarding unjust enrichment law across the country is because not all elements of this cause of action have been explicitly defined by the highest court in each state. For example, the Thompson court cites Effler v. Pyles, 380 S.E.2d 149 (N.C. Ct. App. 1989), to show that North Carolina law requires a plaintiff to have conferred a direct benefit on a defendant in a claim for unjust enrichment. Thompson, 2009 WL 362982, at *5. This would mean, for example, that used car purchasers in North Carolina would not have a legally cognizable claim against a car manufacturer. A different court, analyzing the exact same North Carolina appellate case, disagreed with this interpretation of North Carolina unjust enrichment law. See In re Processed Egg Prods. Antitrust Litig., 851 F. Supp. 2d 867, 931 (E.D. Pa. 2012) ("[T]he Court is not convinced at this time that the Supreme Court of North Carolina would agree with this narrow, highly technical, approach to an unjust enrichment theory of liability.").

49

In this case, if the Unjust Enrichment Class were certified, the Court would have to deal with a multitude of plausible arguments on the precise meaning of unjust enrichment under different state laws to ensure correct jury instructions. This complicated task, while not dispositive, supports the Court's ultimate decision to deny certification of the Unjust Enrichment Class.

Even if such legal disputes could be efficiently resolved, the Court cannot certify the Unjust Enrichment Class because individual facts outweigh those common to the Class. Specifically, the first element of an unjust enrichment claim — whether a Class member conferred a benefit on Ford — again requires an inquiry into each Class member's experience with the Windstar. The Muehlbauer court recognized this difficulty. In Muehlbauer, plaintiffs were the owners of certain General Motors vehicles equipped with allegedly defective ABS systems. 2009 WL 874511, at *1. Plaintiffs claimed that the "ABS allowed corrosion to contaminate the wheel-bearing hub assembly, which affected the ABS wheel speed sensors. The result was unwanted activation of the ABS at low speeds." Id. Plaintiffs moved to certify a multi-state class claiming unjust enrichment, where the proposed class was comprised of all individuals "who purchased or leased [the vehicles at issue] . . . and who experienced unwanted ABS activation while the vehicle was traveling at a speed of greater than 3.7 mph but less than 10 mph." Id. at *2.

In denying class certification, the Muehlbauer court noted that the circumstances under which a class member purchased his car would be relevant to a claim for unjust enrichment because "[o]wners who purchased their vehicles new may have different claims than owners who purchased their vehicles used. In the purchase of a used car, any number of factors may affect the purchase price." Id. at *6. "[N]o benefit attributed to defendant could be considered unjust

where the purchaser paid a significantly under-market price to a third party reseller for some reason unrelated to the ABS defect, such as damage from a prior collision." Id.

In this case, the purchase of the Windstar by Plaintiff illustrates perfectly the point made by the court in Muehlbauer. In September 2001, Plaintiff bought the used Windstar for $22,000 from a family friend. His friend had bought the Windstar new for approximately $30,000, but was forced to sell it quickly and, in Plaintiff's view, at a low price. In considering these facts, has Plaintiff provided a benefit to Ford by purchasing a used Windstar below market price? What if a Class member was given a used Windstar at no cost, perhaps as a gift from a family member — would this Class member have conferred a benefit on Ford? The price and circumstance under which each individual Class member obtained his or her Windstar must be considered by the trier-of-fact in deciding whether Plaintiff has proven the first element of a claim of unjust enrichment.

Moreover, the third element — whether it would be unjust for Ford to retain money provided by Class members in view of the allegedly defective rear axle — is also incapable of proof without reference to individual facts. Proving the rear axle was in fact defective is essential, since Ford's actions could only be considered unjust if money was retained after selling a defective product. However, as explained above in the breach of warranty discussion, to prove a defect requires the trier-of-fact to consider Ford's conduct alongside each Class member's experience with the Windstar. Again, the vast majority of Class members have had no problems with their rear axles. The trier-of-fact would therefore have to consider whether Ford's retention of the full purchase price of a 1998 Windstar, for example, is unjust in a situation where the Windstar has been driven for twelve years without incident. This decision would be different if

the Windstar was only seven years old and the rear axle had fractured.  Thus, a claim of unjust enrichment cannot be established based only on facts common to all Class members.[31]

Consequently, the Court will deny Plaintiff's Motion to Certify the Unjust Enrichment Class for failure to satisfy Rule 23(b)(3) due to the predominance of individual factual inquiries.[32]

---

[31] Also relevant to the present case is the observation of the court in Muehlbauer that "it would be nearly impossible to fashion a remedy . . . without individualized inquiries into each claim." 2009 WL 874511, at *7.  As the court explained:

> Relief under unjust enrichment is equitable in nature. . . .  [and] the defect here manifests at a different time in each vehicle's useful life.  The rate of failure is tied to corrosive environmental conditions, such as rain, snow, and use of road salt.  Vehicles used in the harsh winter climates of states like Wisconsin and Minnesota may develop the contaminating corrosion that fouls the ABS wheel speed sensors at a much quicker rate than vehicles in the desert climate of Nevada.  For that matter, vehicles located within the same state may develop the defect at different times, based on any number of other factors, such as how frequently the vehicle is driven or whether the vehicle is parked on the street throughout the year, or garaged.  Those vehicle owners who suffer unwanted ABS activation toward the beginning of their vehicle's useful life have far different claims that those owners whose cars do not manifest the problem until near the end of their useful life.

Id. at *7.

[32] In denying Plaintiff's Motion for Class Certification under Rule 23(b)(3) in its entirety, the Court notes that Plaintiff has not proposed any alternative class definitions for the Court to consider, nor has the Court attempted to come up with its own workable class definitions out of respect for the goals of Plaintiff's case.  (See Mot. Class Cert. Hr'g Tr. 142:9-10, June 4, 2012 ("[W]e get to define what our case is about, and if it makes sense then the Court needs to respect it.").)  Any attempt to narrow the currently proposed class definitions, however, would likely create a problem on ascertaining the appropriate class.

"[A]n essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria.  If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."  Marcus, 687 F.3d at 592-93 (citations omitted).

### 5.        Superiority of the Class Action

Because Plaintiff's four proposed Classes fail to meet the first requirement of Rule

23(b)(3) — predominance — the Court will only briefly address the second requirement —

superiority.  "The second requirement of Rule 23(b)(3) is that the putative class representatives

demonstrate that 'a class action is superior to other available methods for the fair and efficient

adjudication of the controversy.'"  Chin v. Chrysler Corp., 182 F.R.D. 448, 462 (D.N.J. 1998)

(quoting Fed. R. Civ. P. 23(b)(3)).

Here, Ford argues that a class action is an inefficient way to resolve issues with the

Windstar's rear axle because "[r]egulation by the NHTSA, coupled with tort litigation by persons

suffering physical injury, is far superior to a suit by millions of underlined buyers for dealing with

consumer products that are said to be failure-prone."  See In re Bridgestone/Firestone, Inc., 288

F.3d 1012, 1019 (7th Cir. 2002) (emphasis in original).  Ford cites, among other cases, Chin v.

Chrysler Corp., 182 F.R.D. 448 (D.N.J. 1998), in support of this position.

The facts of the instant case are analogous to those in Chin.  In Chin, the plaintiffs owned

Chrysler vehicles manufactured with an allegedly defective anti-lock braking system ("ABS").

182 F.R.D. at 450-51.  Plaintiffs contended that the ABS was defective because of a leak that

caused or would cause a loss in braking power.  Id. at 451.  Plaintiffs sought to certify a

nationwide class comprised of those who had and those who had not yet suffered problems with

their ABS.  Id.

---

In this case, an alternative class might consist of past and present Windstar owners whose rear axles have fractured.  Although not eliminating all class certification issues, damages could then be calculated using replacement cost, a fairly straightforward determination.  Finding only these Windstar owners could not be done, however, without "individualized fact-finding."  See id.  For example, a 1999 Windstar may have had three owners by the time this lawsuit commenced in 2010.  If the current owner had not experienced an axle failure, both prior owners would have to be contacted to determine if the axle had fractured and been replaced on either of their watches. The need for such "mini-trials" would defeat certification of this class.

After plaintiffs had initiated their lawsuit, Chrysler conducted a voluntary recall of

vehicles equipped with the problem ABS systems as a result of a two-year NHTSA investigation.

As part of the recall:

> Chrysler agreed, through its authorized dealers to (1) inspect and
> perform a specialized diagnostic test on all Chrysler vehicles equipped
> with the . . . ABS; (2) replace malfunctioning . . . ABS components free
> of charge; (3) extend the warranty on all . . . ABS components to 10
> years or 100,000 miles, whichever occurs first . . .; and (4) reimburse
> prior and current owners for previous . . . ABS component expenses
> within the limits of the extended warranty.

Id. at 452.  In denying class certification, the Chin court expressed at length concern about the

effectiveness of a judicial remedy after an NHTSA investigation had already culminated in

Chrysler's voluntary recall of the automotive parts at issue:

> The lack of superiority of a nationwide class action in this case is also
> shown by the fact that, as a result of Chrysler's voluntary recall, it is
> unclear if there is any useful remedy this Court could fashion under the
> laws of certain states even for those Plaintiffs who have suffered
> problems with their ABS systems.
> . . . .
>
> Under the recalls, Chrysler is reimbursing prior and current owners for
> previous repairs to their . . . ABS.
> . . . .
>
> Chrysler's recalls provide for replacement and repair of malfunctioning
> ABS components free of charge.
> . . . .
>
> There are also administrative remedies that are available that may be
> superior to the remedies sought in the nationwide class action suit that
> Plaintiffs have attempted to bring.  Specifically, the Motor Vehicle Safety
> Act, 49 U.S.C. § 30101 et seq., gives NHTSA the authority to investigate
> complaints concerning automobile defects and to order a recall where
> appropriate. Any "interested person" may file a petition with the
> Secretary of Transportation to initiate proceedings aimed at determining
> whether a further recall, in addition to Chrysler's voluntary recall, would
> be appropriate. 49 U.S.C. § 30162(a)(2).
>
> Most of the Plaintiffs have not suffered ABS failure, and seek relief for
> an alleged defect that has not yet manifested itself or caused damage in

54

their vehicles. For those Plaintiffs who have suffered problems with their ABS systems, Chrysler's voluntary recall program provides for replacement of the malfunctioning ABS systems. The Court is convinced that in such situations, the administrative remedy provided by NHTSA, including recall of vehicles for inspection and/or repair, is more appropriate than civil litigation seeking equitable relief and money damages in a federal court. The Court concludes that there is insufficient justification to burden the judicial system with Plaintiffs' claims while there exists an administrative remedy that has been established to assess the technical merits of such claims and that can handle further recall or enforce the current recall and replacement of the ABS systems, if appropriate.

The Court recognizes that the Motor Vehicle Safety Act and NHTSA itself do not in any way preempt a plaintiff's right to bring common law claims against the manufacturer of an allegedly defective part. [See 49 U.S.C. § 30103.] The Court is also aware of the statutory limitations of NHTSA. . . . At any rate, the Court does not deny certification in this case based merely on the existence of NHTSA. As the Court pointed out in Ford Ignition Switch, "[t]he Court has mentioned the availability of a NHTSA remedy issue only to demonstrate that issues such as those involved in this [ ] case are likely to be more efficiently resolved by administrative action as opposed to a nation-wide, federal court class action adjudicating the rights of" the hundreds of thousands of potential class members who own or have owned Chrysler vehicles with the . . . ABS systems, the majority of whose vehicles have never manifested any problem with the ABS systems in question. [174 F.R.D. 332, 352 (D.N.J. 1997).]

Id. at 463-65.

In this case, the NHTSA initiated a Preliminary Evaluation of the Windstar's rear axle after receiving 234 consumer complaints, approximately 96% of which came from Windstar owners in high-corrosion states. Like Chin, the NHTSA investigation culminated in a voluntary safety recall in over twenty-one states. Ford's recall provided approximately 575,000 Windstar owners — out of a total Windstar population of about 961,000 — the opportunity to receive rear axle reinforcement brackets or replacement axles free of charge.

Each of Plaintiff's proposed Classes includes Class members from states that were subject to the recall. As of December 2011, an estimated 308,700 Windstars were inspected by

55

Ford as part of the safety recall.  Consequently, Ford previously provided some form of relief to potentially 1/3 of Class members.  While this relief does not preclude an award of damages, it certainly complicates the process of calculating the proper amount of damages, if awarded, due to each Class member.  Thus, consistent with the rationale of <u>Chin</u>, the Court notes that a class action seeking monetary damages does not appear to be an efficient way of resolving rear axle problems[33] for Windstar owners in recall states who have already received replacement axles or reinforcement brackets from Ford.[34]

In sum, the Court will deny certification of the proposed Express Warranty, Implied Warranty, Consumer Protection, and Unjust Enrichment Classes under Rule 23(b)(3).

---

[33] Ford previously moved to dismiss the instant case by arguing that the safety recall made the claims of Plaintiff moot.  The Court disagreed with Ford at that time because the relief Plaintiff was seeking in the lawsuit was broader than what Ford had provided through the recall.  Specifically, Plaintiff sought monetary damages and an expansion of the recall to include Class members nationwide.  At this stage of the litigation, the Court now has additional factual information and the voluntary recall appears to be a more efficient way to handle the Windstar issues.

[34] Rule 23(b)(3) directs a court to consider whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  It is an open question in this Circuit whether the term "adjudication" refers solely to lawsuits or can also include other types of proceedings, such as the NHTSA investigation.  <u>Compare</u> <u>Amalgamated Workers Union v.</u> <u>Hess Oil Virgin Islands Corp.</u>, 478 F.2d 540, 542-43 (3d Cir. 1973) ("As we view it . . . . possible administrative remedies were not intended to be considered as 'other available methods' in deciding whether the class action is maintainable under Rule 23 . . . .  [but] [w]e leave this question, however, for disposition in an appropriate case."), <u>with</u> <u>Chin</u>, 182 F.R.D. at 464 ("[T]his Court is not bound by dicta, and research reveals that the <u>Amalgamated</u> court's views on this topic are not universally held.").  In this case, the Court does not need to decide the appropriate scope of "adjudication" in the context of a class certification analysis because "the Court does not deny certification in this case based merely on the existence of NHTSA."  <u>See</u> <u>Chin</u>, 182 F.R.D. at 464.

**C.    Federal Rule of Civil Procedure 23(b)(2): Class Action Seeking Declaratory and/or Injunctive Relief**

As an alternative to, or in conjunction with, certification under Rule 23(b)(3), Plaintiff

seeks to certify the following nationwide Class under Rule 23(b)(2):

> All individuals within the United States and its territories who have acquired, by lease or purchase, a 1998[ ½ ], 1999, 2000, 2001, 2002, or 2003 model year Ford Windstar minivan and still own the vehicle.

(Doc. No. 62 at 1.)[35]  For this Class, Plaintiff seeks the following relief:  (1) require Ford to

expand the safety recall nationwide, and (2) compel Ford to provide all Windstar owners with a

replacement axle and/or equitable restitution.  (Id. at 28.)  For reasons that follow, the Court will

deny certification of a Rule 23(b)(2) Class.

As stated previously, all class actions — whether certified under Rule 23(b)(2) or (b)(3)

— must first satisfy the requirements of Rule 23(a), that is, numerosity, commonality, typicality,

and adequacy.  In this case, Plaintiff is neither a typical nor an adequate representative for a

nationwide Class seeking to compel Ford to expand the safety recall and provide replacement

axles to all Class members.

As noted above, the typicality requirement set forth in Rule 23(a)(3) is in place to

"'screen out class actions in which the legal or factual position of the representatives is markedly

---

[35] Plaintiff initially sought to certify all classes using this definition.  (See Doc. No. 62.) However, after the first round of briefing and the class certification hearing held by the Court on June 4, 2012, Plaintiff's Supplement to Proposed Trial Plan (Doc. No. 83) specifically reduced the number of states included in the Express Warranty, Implied Warranty, Unjust Enrichment, and Consumer Protection Classes for Rule 23(b)(3) purposes.  The Supplement was silent, however, as to certification under Rule 23(b)(2).  As a result, Ford argued in its Supplemental Memorandum in Opposition (Doc. No. 85) that Plaintiff had abandoned the attempt to certify a class for declaratory and/or injunctive relief.  In subsequent filings, Plaintiff did not respond to Ford's claim of abandonment.  Although it is possible Plaintiff has decided not to pursue Rule 23(b)(2) certification, the Court will address the issue since it was raised in Plaintiff's initial Motion for Class Certification.  In this analysis, the Court will use the unmodified Class definition set forth in Plaintiff's original Motion for Class Certification.

different from that of other members of the class even though common issues of law or fact are present.'" Marcus, 687 F.3d at 598 (citation omitted). To determine whether a "legal or factual position" is "markedly different" requires a district court to "consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class." Id.

Here, the rear axle of Plaintiff's Ford Windstar fractured in May 2010. Later that same year, Ford initiated a voluntary safety recall, which, as a resident of Pennsylvania, entitled Plaintiff to replacement of his broken axle free of charge. Plaintiff chose not to participate in the recall. His factual position relative to other Class members is therefore "markedly different," since he previously declined the injunctive relief he now seeks through this lawsuit. Thus, Plaintiff does not meet the typicality requirement of Rule 23(a)(3).

For similar reasons, Plaintiff is not an adequate representative of this Rule 23(b)(2) Class. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). "Certain intra-class conflicts may cause the interests of the representative plaintiffs to diverge from those of the unnamed class members. The adequacy requirement 'is designed to ferret out' such conflicts of interest." Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 183-84 (3d Cir. 2012) (citation omitted).

Again, Plaintiff was offered — and he declined — the very remedies he now seeks to obtain through a Rule 23(b)(2) Class action. Moreover, Plaintiff testified to the following at his deposition:

> Defense counsel: If the case were over and you fixed the rear axle, would you drive it again?
>
> Plaintiff:        No.
>
> Defense counsel: Why not?

> Plaintiff:      I don't ever want to get in another Windstar. Someone could even tell me it is completely safe. I still wouldn't want to drive it because we had an experience that was disruptive.

(Doc. No. 67, Ex. B at 125.) Consequently, because Plaintiff's actions and statements indicate that he "may have different incentives in terms of how much time, energy, and money [he] is willing to spend pursuing the claim," In re Schering Plough Corp. ERISA Litigation, 589 F.3d 585, 602 (3d Cir. 2009), he is an inadequate representative for a Class seeking to compel Ford to expand its safety recall and provide replacement axles to all Windstar owners.

Even assuming Plaintiff could meet the standards of Rule 23(a), he fails to satisfy the requirements of certification under 23(b)(2) for a class seeking injunctive and/or declaratory relief. Federal Rule of Civil Procedure 23(b)(2) states:

> A class action may be maintained if Rule 23(a) is satisfied and if:
>
> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . .

Id.

In Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011), the Supreme Court explained that "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" Id. at 2557 (citation omitted). The Supreme Court held that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification

when each class member would be entitled to an individualized award of monetary damages." Id. (emphasis in original).

In applying Dukes, the Third Circuit noted that "a (b)(2) class may require more cohesiveness than a (b)(3) class.'" Gates v. Rohm & Haas Co., 655 F.3d 255, 264 (3d Cir. 2011) (citation omitted). "As all class members will be bound by a single judgment, members of a proposed Rule 23(b)(2) injunctive or declaratory class must have strong commonality of interests." Id.

In this case, for reasons similar to those stated above, the proposed Rule 23(b)(2) Class lacks the "strong commonality of interests" necessary for class certification.[36] The proposed nationwide Class includes Ford Windstar owners who reside in recall states and those who do not reside in such states. Of those who reside in recall states, there are Windstar owners who chose, like Plaintiff, not to participate in the recall, as well as Windstar owners who participated in the recall and received replacement axles or reinforcement brackets, and approximately 5,400 owners who had their Windstars repurchased by Ford. Consequently, there is not "a single injunction or declaratory judgment [that] would provide relief to each member of the class." See Dukes, 131 S. Ct. at 2557. For example, a Class member whose Windstar was repurchased would not be entitled to, nor would he have a need for, a replacement axle. Nor could a single injunction provide similar relief to a Class member from a non-recall state and to one who resides in a recall state and experienced a rear axle fracture, yet chose not to receive a replacement axle from Ford.

---

[36] In Dukes, the Supreme Court made clear that "individualized monetary claims belong in Rule 23(b)(3)." 131 S. Ct. at 2558. Consequently, restitution, which is one form of relief Plaintiff seeks in this case, is not a permissible remedy for a class certified under Rule 23(b)(2). Thus, in analyzing the proposed (b)(2) Class, the Court will only consider the injunctions Plaintiff seeks, namely, the nationwide recall and replacement axles.

Plaintiff cites <u>Pella Corp. v. Saltzman</u>, 606 F.3d 391 (7th Cir. 2010), as a model for how this Court can certify the proposed (b)(2) Class.  In <u>Pella</u>, the defendant, Pella Corporation, manufactured and sold over six million "aluminum-clad wood 'ProLine' casement windows" to residential homeowners across the nation.  <u>Id.</u> at 392.  In time, homeowners began filing complaints with Pella, which alleged that a design defect was allowing water to seep behind the aluminum cladding and causing the wooden window frame to rot at a faster rate than normal.  <u>Id.</u> In response to numerous customer complaints, Pella established the "Pella ProLine Customer Service Enhancement Program" to deal specifically with affected customers.  <u>Id.</u>  Pella did not, however, publicly announce this program.  <u>Id.</u>

Several Pella customers then filed a class action lawsuit in which certification was sought under Rule 23(b)(2) for Pella customers who had not yet experienced problems with their windows or only experienced some rot but had not had their windows replaced, and Rule 23(b)(3) for those who previously had their Pella windows replaced.  <u>Id.</u> at 392-93.  If successful, (b)(2) class members would have been entitled to the following six declarations:

> [1] that all ProLine windows have a defect which results in premature rotting and this defect requires disclosure; [2] that Pella modified its warranty without notice by creating the enhancement program; [3] that Pella must notify owners of the defect; [4] that the ten-year limitation in the original warranty is removed; [5] that Pella will reassess all prior warranty claims related to wood rot; and [6] that Pella, upon a class member's request, will pay the cost of inspection to determine whether the wood rot is manifest, with any coverage disputes adjudicated by a Special Master. This class adjudication process would be followed by an individual claims process in which class members may file a claim with Pella for service "[i]f and when their windows manifest wood rot due to the alleged defect."

<u>Id.</u> at 392.

The district court certified both classes, and the Seventh Circuit affirmed.  In reaching this decision, the Seventh Circuit explained:

Those who have not replaced their windows but might in the future because of the purported design flaw are properly members of a (b)(2) class. Such purchasers would want declarations that there is an inherent design flaw, that the warranty extends to them and specific performance of the warranty to replace the windows when they manifest the defect, or final equitable relief.

If the district court finds in favor of the class and enters all six declarations, the cumulative effect will be an entitlement to have their windows replaced, and the (b)(2) class will benefit uniformly from the declarations. The contemplated process in which members may file a claim with Pella for service does not appear to be any different than the process by which an owner would file a claim with Pella under a warranty.
. . . .

Moreover, the district court specifically provided that "[t]here is no side-by-side recovery here." It explained that class members whose defect has not yet manifested are not included in the damages class; only once the windows experience any manifest defect, if ever, will the class members be able to submit a claim to Pella for repair.

Id. at 395.

Pella is distinguishable from the instant case for several reasons.  First, the class definitions in Pella were far narrower than what has been proposed in this case.  In Pella, the only customers included in the (b)(2) class were those who had not received any form of relief from Pella and likely were unaware of the ProLine Customer Service Enhancement Program that Pella had created to address the window problems.  Here, Plaintiff's proposed nationwide Class includes Ford Windstar owners from recall and non-recall states.  The proposed (b)(2) Class therefore has members who have already received the relief this lawsuit seeks.

Second, Pella established the ProLine Customer Service Enhancement Program to deal with numerous customer complaints about the premature rotting of its windows, but Pella did not make the Program publicly known to its customers.  Those with window problems only learned

of the Program when they called Pella to complain.  One of the stated purposes of the (b)(2) class action was to make the Program publicly known to Pella's customers.

In this case, on the other hand, an NHTSA investigation was conducted which culminated in Ford's voluntary safety recall.  The recall was offered to over half of all Windstar owners, carried out by Ford dealerships across the country, and the details of the recall were made publicly available on the NHTSA website.  Thus, unlike the situation in Pella, the problems with the Windstar's rear axle and the remedies being offered by Ford were not concealed.

Lastly, in Pella, the (b)(2) class was not seeking window replacements, but rather, affirmative declarations indicating that the windows were defective, which would entitle window owners to replacement if their windows prematurely rotted.  As the Seventh Circuit explained, "'[t]here is no side-by-side recovery here'. . . . only [when] the windows experience any manifest defect, if ever, will the class members be able to submit a claim to Pella for repair."  606 F.3d at 395.

Here, the proposed (b)(2) Class seeks rear axle replacements for all Windstar owners, regardless of whether their axles have fractured or show signs of cracking.  Consequently, neither the legal nor factual positions of the plaintiffs in Pella provide support for certification of the proposed Rule 23(b)(2) Class in this case.[37]

---

[37] As for the Rule 23(b)(3) certification in Pella, unlike Plaintiff's proposals, the Pella court only certified classes for purposes of liability.  In reaching this decision, the Seventh Circuit explained:

> A district court has the discretion to split a case by certifying a class for some issues, but not others, or by certifying a class for liability alone where damages or causation may require individualized assessments.  Under the district court's plan, class members still [had to] prove individual issues of causation and damages.

606 F.3d at 394 (internal citations omitted).  This methodology would not work, however, for Plaintiff's proposed Express Warranty, Implied Warranty, Consumer Protection, and Unjust

Consequently, the Court will deny Plaintiff's Motion to certify a Class for declaratory and/or injunctive relief for failure to satisfy the typicality and adequacy requirements of Rule 23(a), and for an inability to demonstrate the strong commonality of interests necessary for certification of the Class under Rule 23(b)(2).

## V.      CONCLUSION

Based on the foregoing reasons, the Court will deny Plaintiff's Motion for Class Certification.

An appropriate Order follows.

---

Enrichment Classes.  For example, determining liability for the Implied Warranty Class, as explained above, requires individualized inquiries of fact that defeat the predominance required to certify a class under Rule 23(b)(3).  Thus, the reasoning in Pella does not support Plaintiff's Motion to certify Rule 23(b)(3) classes.  See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n, 286 F.R.D. 355, 378-79 (N.D. Ill. 2012) ("[T]here was a foundational common question [in Pella] that could be answered independently of the individual issues that might exist. . . . A court could determine whether the design was defective and issue a declaratory judgment to that effect without considering the many individual issues that could arise concerning damages.").